No. 23-174C
(Judge Dietz)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

JEREMIAH BOTELLO, et al.,
Plaintiffs,

v.

THE UNITED STATES,
Defendant.

---

DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF
SUBJECT-MATTER JURISDICTION AND FOR FAILURE TO STATE A CLAIM

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

WILLIAM J. GRIMALDI
Assistant Director

OF COUNSEL:                          KYLE S. BECKRICH
                                     Trial Attorney
HOLLY K. BRYANT                      Commercial Litigation Branch
Litigation Attorney                  Civil Division
U.S. Army Legal Services Agency      Department of Justice
                                     P.O. Box 480
JENNY L. NAYLOR                      Ben Franklin Station
Lieutenant Colonel, Judge Advocate   Washington, D.C. 20044
Litigation Attorney                  Tel: (202) 616-9322
National Guard Bureau                Fax: (202) 305-7644
Office of the General Counsel        Kyle.Beckrich@usdoj.gov

September 29, 2023                    Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

QUESTIONS PRESENTED ...................................................................................................2

STATEMENT OF THE CASE................................................................................................3

I.     The Rescinded COVID-19 Vaccination Requirement .......................................3

II.    Plaintiffs File Their Complaint In This Court...................................................6

III.   Related Litigation ................................................................................................8

STANDARD OF REVIEW......................................................................................................9

I.     Subject-Matter Jurisdiction ..............................................................................9

II.    Failure To State A Claim Upon Which Relief Can Be Granted .....................11

ARGUMENT.........................................................................................................................12

I.     Plaintiffs' Claims Under Count I Fail Because The Militia Clauses Are Not Money-Mandating ....................................................................................................13

II.    Plaintiffs' Claims Under Count II Fail Because The FY 2023 NDAA Is Not Money-Mandating, And The Plaintiffs Can Show No Violation Of The Statute .........................16

        A.    The NDAA Is Not Money-Mandating ...............................................16

        B.    The NDAA Does Not Provide Retroactive Relief..............................19

III.   Plaintiffs' Claims Under Count III Fail Because Plaintiffs Lack Standing And Otherwise Fail To State A Claim ........................................................................................23

IV.   Plaintiffs' Claims Under Count IV Fail Because Four Plaintiffs Fail To State A Claim, While One Plaintiff Suffers From A Section 1500 Defect ...............................................26

        A.    Four Of The Six Plaintiffs Fail To State A Claim ...............................27

        B.    The Court Lacks Jurisdiction Over Mr. Botello's Claim Under 28 U.S.C. § 1500....................................................................................................29

V.    Plaintiffs Are Not Entitled To Any Relief Under The Military Pay Act And Thus Fail To State A Claim Under Counts III and IV .......................................................................31

VI.   Plaintiffs' Claims For Illegal Exaction Under Count V Fail Because Plaintiffs Do Not Allege Any Money Was Illegally Exacted From Them ..................................................35

VII.    Plaintiffs' Claims Under Count VI Fail Because 10 U.S.C. § 1552 Is Not Money-
        Mandating And Plaintiffs Have Not Otherwise Pled A Claim Entitling Them To Relief
        From The Correction Boards ........................................................................................38

        CONCLUSION.................................................................................................................39

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Abbott v. Biden*,
   70 F. 4th 817 (5th Cir. 2023) ............................................................................................. 14

*Aldinger v. Howard*,
   427 U.S. 1 (1976) ............................................................................................................... 10

*Allen v. United States*, No.,
   09-33304, 2023 WL 3737120 (Fed. Cl. May 31, 2023) ..................................................... 11

*Antonellis v. United States*,
   723 F.3d 1328 (Fed. Cir. 2013) ................................................................................... 34, 35

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................................... 11, 27

*Boeing Company v. United States*,
   968 F.3d 1371 (Fed. Cir. 2020) ................................................................................... 36, 37

*Booth v. United States*,
   990 F.2d 617 (Fed. Cir. 1993) ........................................................................................... 10

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988) ........................................................................................................... 20

*BP America Production Co. v. United States*,
   148 Fed. Cl. 185 (2020) ..................................................................................................... 20

*Brandt v. United States*,
   710 F.3d 1369 (Fed. Cir. 2013) ......................................................................................... 30

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ........................................................................................................... 27

*Capelouto v. United States*,
   99 Fed. Cl. 682 (2011) ....................................................................................................... 30

*Carmichael v. United States*,
   298 F.3d 1367 (Fed. Cir. 2002) ......................................................................................... 28

*Cyprus Amax Coal Co. v. United States*,
   205 F.3d 1369 (Fed. Cir. 2000) ................................................................................... 15, 16

*Dehne v. United States,*
   970 F.2d 890 (Fed. Cir. 1992) ......................................................................32

*Dimare Fresh, Inc. v. United States,*
   808 F.3d 1301 (Fed. Cir. 2015) .......................................................................3

*Doe v. United States,*
   106 Fed. Cl. 118 (2012) ...............................................................................11

*Eastport S.S. Corp. v. United States,*
   372 F.2d 1002 (Ct. Cl. 1967)........................................................................36

*Hatter v. United States,*
   953 F.2d 626 (Fed. Cir. 1992) ......................................................................15

*Henke v. United States,*
   60 F.3d 795 (Fed. Cir. 1995) ........................................................................11

*Hicks v. Merit Sys. Prot. Bd.,*
   819 F.3d 1318 (Fed. Cir. 2016) ....................................................................20

*Huber v. United States,*
   29 Fed. Cl. 260 (1993) .............................................................................7, 32

*Keene Corp. v. United States,*
   508 U.S. 200 (1993)......................................................................................10

*Klingenschmitt v. United States,*
   119 Fed. Cl. 163 (2014) ...............................................................................26

*Landgraf v. USI Film Products,*
   511 U.S. 244 (1994)......................................................................................20

*Lindsay v. United States,*
   295 F.3d 1252 (Fed. Cir. 2002) ....................................................................11

*Longhofer v. United States,*
   29 Fed. Cl. 595 (1993) .................................................................................28

*Martinez v. United States,*
   333 F.3d 1295 (Fed. Cir. 2003) ....................................................................38

*Media Techs. Licensing, LLC v. Upper Deck Co.,*
   334 F.3d 1366 (Fed. Cir. 2003) ....................................................................24

*Metz v. United States,*
   466 F.3d 991 (Fed. Cir. 2006) ......................................................................28

iv

*New Valley Corp. v. United States,*
  119 F.3d 1576 (Fed. Cir. 1997) ...................................................................................12

*New York & Presbyterian Hosp. v. United States,*
  881 F.3d 877 (Fed. Cir. 2018) .....................................................................................17

*Opati v. Republic of Sudan,*
  140 S. Ct. 1601 (2020)..................................................................................................20

*Palmer v. United States,*
  168 F.3d 1310 (Fed. Cir. 1999) ...................................................................... 32, 34, 35

*Paradise Creations, Inc. v. UV Sales, Inc.,*
  315 F.3d 1304 (Fed. Cir. 2003) ...........................................................................24, 33

*Perez v. United States,*
  156 F.3d 1366 (Fed. Cir. 1998) ..............................................................................12, 27

*Pohanic v. United States,*
  48 Fed. Cl. 166 (2000) .................................................................................. 32, 33, 34

*Prophet v. United States,*
  106 Fed. Cl. 456 (2012) ...............................................................................................30

*Reilly v. United States,*
  93 Fed. Cl. 643 (2010) .................................................................................................35

*Reynolds v. Army and Air Force Exch. Serv.,*
  846 F.2d 746 (Fed. Cir. 1988) .....................................................................................11

*Riser v. United States,*
  97 Fed. Cl. 679 (2011) ..............................................................................................7, 32

*Smith v. Sec'y of the Army,*
  384 F.3d 1288 (Fed. Cir. 2004) ..............................................................................34, 35

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998).........................................................................................................9

*Thomas v. United States,*
  42 Fed. Cl. 449 (1998) .................................................................................................28

*Tippett v. United States,*
  185 F.3d 1250 (Fed. Cir. 1999) ...................................................................................28

*Trusted Integration, Inc. v. United States,*
  659 F.3d 1159 (Fed. Cir. 2011) ...................................................................................30

*United States v. Mitchell*,
    463 U.S. 206 (1983)...................................................................................10, 15

*United States v. Testan*,
    424 U.S. 392 (1976)........................................................................................10

*United States v. Tohono O'Odham Nation*,
    563 U.S. 307 (2011)........................................................................................30

*United States v. White Mountain Apache Tribe*,
    537 U.S. 465 (2003)................................................................ 10, 17, 18, 19

*Vartelas v. Holder*,
    566 U.S. 257 (2012)........................................................................................20

*Virgin Islands Port Authority v. United States*,
    922 F.3d 1328 (Fed. Cir. 2019) ................................................................36, 37

*Visconi v. United States*,
    98 Fed. Cl. 589 (2011) ................................................................................11, 38

*Voge v. United States*,
    844 F.2d 776 (Fed. Cir. 1988) ......................................................................38

## **Constitutional Provisions**

U.S. Const. Art. I, § 8, cls. 15, 16...................................................................7, 14

U.S. Const. Art. III, § 1 .........................................................................................15

U.S. Const. Art. I, § 9, cl. 5 ....................................................................................16

## **Statutes**

1 U.S.C. § 109.....................................................................................................20, 22

10 U.S.C. § 101.....................................................................................................7, 33

10 U.S.C. § 1107a...............................................................................................passim

10 U.S.C. § 1552.....................................................................................3, 8, 13, 38

10 U.S.C. § 10503...................................................................................................4

28 U.S.C. § 1491....................................................................................................10

28 U.S.C. § 1500................................................................................................26, 29

32 U.S.C. § 110 ......................................................................................................................4

32 U.S.C. § 502 ...........................................................................................................7, 33, 34

37 U.S.C. § 204 ...............................................................................................................passim

37 U.S.C. § 206 ...........................................................................................................7, 32, 33

42 U.S.C. § 2000bb .....................................................................................................2, 13, 26

42 U.S.C. § 2000bb-1 ...........................................................................................................27

Ariz. Rev. Stat. Ann. § 26-102 ............................................................................................4

Ga. Code. Ann. § 38-2-110 ..................................................................................................4

S.C. Code Ann. §§ 25-1-30 ..................................................................................................4

## Rules

FRCP 17 ..................................................................................................................................9

RCFC 8 .................................................................................................................................11

RCFC 9 ...................................................................................................................................8

RCFC 12 ...............................................................................................................................11

## Other Authorities

5B Wright & Miller, Fed. Prac. & Proc. Civ. § 1357 (3d. ed.) .......................................3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JEREMIAH BOTELLO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 23-174 |
| v. | ) | (Judge Dietz) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF
## <u>SUBJECT-MATTER JURISDICTION AND FOR FAILURE TO STATE A CLAIM</u>

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss plaintiffs' amended complaint, ECF No. 20 (Am. Compl.), for lack of jurisdiction and failure to state a claim. In support of this motion, we rely upon the First Amended Complaint, the following brief, and the appendix attached to this brief.

## <u>INTRODUCTION</u>

Plaintiffs are a group of six current Army and Air National Guard members who raise challenges to the now-rescinded Department of Defense (DoD) COVID-19 vaccine requirement and seek backpay and other money damages. After the Secretary of Defense rescinded the requirement in January 2023 pursuant to Congress's instruction in the Fiscal Year 2023 National Defense Authorization Act (NDAA), plaintiffs filed a class-action complaint before this Court, which we moved to dismiss. ECF No. 11. In response, plaintiffs filed this amended complaint on August 4, 2023. ECF No. 20. Plaintiffs seek hundreds of thousands of dollars in backpay and fees under statutory authorities that both fall outside this Court's limited grant of jurisdiction and provide them no relief. They also seek to be compensated for unperformed duty, even though

precedent makes clear that members of the National Guard are not entitled to such relief. Further, plaintiffs ask the Court to direct the military record correction boards for relief that plaintiffs have failed to seek from the boards themselves.  Because each of their claims is either outside this Court's jurisdiction or fails based upon the facts pled, we respectfully request that the Court dismiss the complaint.

## **QUESTIONS PRESENTED**

1.      Whether plaintiffs' claim for violation of the Militia Clauses is within the Court's jurisdiction when the Militia Clauses are not money-mandating.

2.      Whether plaintiffs' claim for violation of the NDAA is within the Court's jurisdiction when the NDAA is not money-mandating.

3.      Whether plaintiffs have stated a claim for violation of the NDAA when the NDAA does not require retroactive rescission of the vaccination requirement and all of their discharges and other alleged harms occurred before it was enacted.

4.      Whether plaintiffs have standing to assert, or otherwise state a claim for, wrongful discharge under 10 U.S.C. § 1107a (a statute setting forth certain conditions for emergency use products) when they did not allege facts showing that their discharges and other alleged harms were related to that statute.

5.      Whether four of the plaintiffs state a claim for wrongful discharge under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, when they did not allege facts showing that they sought relief from the vaccination requirement based on their religious beliefs.

6.      Whether any plaintiff states a claim for entitlement to pay under the Military Pay Act, 37 U.S.C. §§ 204 and 206, when they do not allege that they performed any service for which they were not compensated.

7.      Whether plaintiffs state a claim for illegal exaction upon which relief may be granted when they do not allege that any money was taken from them in violation of the Constitution, a statute, or a regulation.

8.      Whether plaintiffs' claim under 10 U.S.C. § 1552 (a statute related to the correction of military records) is within the Court's jurisdiction when section 1552 is not money-mandating.

## **STATEMENT OF THE CASE**

### I.      **The Rescinded COVID-19 Vaccination Requirement**

On August 24, 2021, the Secretary of Defense directed the Secretaries of the Military Departments to ensure that all members of the Armed Forces were fully vaccinated against COVID-19.  Am. Compl. ¶ 27; ECF No. 1-2.[1]  On November 30, 2021, DoD issued a supplemental directive confirming that the vaccination requirements applied to members of the Ready Reserve and National Guard.  Am. Compl. ¶ 39; ECF No. 1-3.  Each of the military services implemented that directive by, among other things, prohibiting unvaccinated reservists and members of the National Guard from participating in drills and training and from taking on new orders.  *See* Am. Compl. ¶¶ 39-40.  Consistent with existing law and policies, the military services permitted service members to seek medical, religious, and/or administrative exemptions from the vaccination requirement based on individual circumstances.  *See id.* ¶ 215.  Further, the vaccination policy expressly stated that service members were required to receive only "COVID-19 vaccines that receive full licensure . . . in accordance with [U.S. Food and Drug

---

[1]  In addition to the facts pleaded in the complaint, "courts may consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."  5B Wright & Miller, Fed. Prac. & Proc. Civ. § 1357 (3d ed.); *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015).

Administration (FDA)]-approved labeling and guidance." *Id.* ¶ 28; ECF No. 1-2 at 1.  Likewise,

the policy did not require service members to receive a COVID-19 vaccine from DoD medical

personnel, but rather allowed them to use any medical service provider.  *See* ECF No. 1-2 at 1.

The Army National Guard and the Air National Guard follow the regulations and policies

prescribed by the Department of the Army and the Department of the Air Force, respectively.

*See* 32 U.S.C. §§ 110, 501; 10 U.S.C. § 10503 (3), (4).  State Army National Guard and Air

National Guard units may implement such Federal regulations and policies by issuing state-

specific general orders or implementation guidance.  *See, e.g.*, Ariz. Rev. Stat. Ann. § 26-102;

Ga. Code. Ann. § 38-2-110; S.C. Code Ann. §§ 25-1-30, 25-1-360.

On December 23, 2022, the President signed into law the James M. Inhofe National

Defense Authorization Act for Fiscal Year 2023.  Pub. L. No. 117-263, § 525, 136 Stat. 2395,

2571–72 (2022).  Section 525 of the NDAA directed the Secretary of Defense to rescind the

August 2021 COVID-19 vaccination requirement.  *See id.* at § 525.  In compliance with

Congress's directive, on January 10, 2023, the Secretary of Defense rescinded the August 2021

COVID-19 vaccination requirement.  Am. Compl. ¶ 71; ECF No. 1-4.

The Secretary's rescission memorandum provides that current service members who

requested an exemption from the vaccination requirement may not be "separated solely on the

basis of their refusal to receive the COVID-19 vaccination" and directs the military services to

"update the records of such individuals to remove any adverse actions solely associated with

denials of such requests" for exemption.  ECF No. 1-4 at 1.  Further, the recission memo directed

that former service members who were administratively discharged on the sole basis that they

failed to obey an order to receive a COVID-19 vaccine "may petition their Military Department's

Discharge Review Boards and Boards for Correction of Military or Naval Records to

individually request a correction to their personnel records, including records regarding the characterization of their discharge." *Id.* at 2.

Following the Secretary's recission memorandum, the Department of Defense and the Departments of the Army, Navy, and Air Force and the National Guard Bureau issued further guidance implementing the rescission of the COVID-19 vaccination requirement and commencing the removal of adverse actions associated with it. Am. Compl. ¶ 77. On January 18, 2023, the Chief of the National Guard Bureau issued a memorandum to the Adjutants General and the Commanding General of the District of Columbia stating that "all currently serving non-federalized Army National Guard and Air National Guard members who are not fully vaccinated for COVID-19, but are otherwise qualified and eligible are no longer prohibited from, and may be directed to resume participation in drills, training, and/or other duty conducted under Title 32, U.S. Code, to include [Active Guard Reserve] and [Full Time National Guard Duty-Operational Support] duties." Appx14. The Vice Chief of the National Guard Bureau further issued a memorandum to all National Guard personnel authorizing National Guard members who were not vaccinated to conduct official travel to or from locations outside and within the United States. Appx15-16.

On February 24, 2023, the Deputy Secretary of Defense issued guidance that the January 10, 2023, rescission memorandum "rendered all [Department of Defense] Component policies, directives, and guidance implementing [the] vaccination mandates as no longer in effect as of January 10, 2023," including "any COVID-19 vaccination requirements or related theater entry requirements and any limitations on deployability of service members who are not vaccinated against COVID-19." Appx1. The Deputy Secretary directed commanders to comply with foreign-nation entry requirements, but otherwise prohibited individual commanders from

requiring vaccination against COVID-19 or considering a service member's COVID-19 immunization status when making "deployment, assignment, and other operational decisions, absent establishment of a new immunization requirement" to be approved at the level of the Assistant Secretary of Defense for Health Affairs, which will occur "only when justified by compelling operational needs and . . . as narrowly tailored as possible."  Appx2.

In addition to this guidance, each service directed corrections to the records of current service members who had been subject to adverse actions for refusing to receive the COVID-19 vaccination and who sought a medical or administrative exemption and directed former service members to the relevant service records correction boards to address their claims.  Appx3-6; Appx9-11; Appx12-13.

## II.   **Plaintiffs File Their Complaint In This Court**

On February 8, 2023, nine members of the Army National Guard, Air National Guard, Army Reserve, and Air Force Reserve filed a class action complaint in this case.  After we moved to dismiss the complaint, eight[2] of the original nine plaintiffs voluntarily dismissed their claims, leaving only Jeremiah Botello as plaintiff.  *See* ECF No. 15.  Mr. Botello filed an amended complaint on August 4, 2023.  In the amended complaint, five other members of the Army and Air National Guard joined the case.  Plaintiffs allege that, between September 2021 and May 2022, they were released from Full-Time National Guard Duty (FTNGD) or Active Duty for Operational Support (ADOS) orders,[3] or were otherwise denied the opportunity to

---

[2]  Four of those eight plaintiffs were subsequently added as named plaintiffs in *Bassen v. United States*, No. 23-211 (Fed. Cl.).

[3]  FTNGD "means training or other duty, other than inactive duty, performed by a member of the Army . . . or the Air National Guard of the United States in the member's status as a member of the National Guard of a State or territory, the Commonwealth of Puerto Rico, or the District of Columbia . . . for which the member is entitled to pay from the United States or

work, due to their vaccination status.  *See* Am. Compl. ¶¶ 16, 17, 18, 20, 22, 24.  Notably, no

plaintiff alleges that he was not compensated for any duty he actually performed.  Further, only

two plaintiffs—Benjamin Konie and Victor Santos—allege that they submitted religious

accommodation requests (RAR) to be exempted from the vaccination requirement.  Am. Compl.

¶¶ 17, 20.

Plaintiffs claim the curtailment of their existing Title 32 FTNGD or ADOS orders and the

other harms they allege violated the Militia Clauses, U.S. Const. Art. I, § 8, cls. 15, 16 (*see id*. ¶¶

245-66), the NDAA (*see id.* ¶¶ 267-90)), 10 U.S.C. § 1107a (*see id.* ¶¶ 291-19), and RFRA (*see*

*id.* ¶¶ 320-34), thereby entitling them to money relief under the Tucker Act and the Military Pay

Act, 37 U.S.C. §§ 204 and 206.[4]  Plaintiffs also contend that the harms they allege constitute

illegal exactions, evidently based on the Government's failure to pay them while they were not

vaccinated.  *See id.* ¶¶ 335-41.  No plaintiff alleges any facts that the Government illegally

recouped any money from them.  *Id.* ¶¶ 16-24.  Only one plaintiff, Brian Taylor, alleges any

recoupment, which was for approximately $60 of unpaid premiums for maintaining his

Servicemembers' Group Life Insurance (SGLI) Plan benefits.  *Id.* ¶ 24.  Finally, plaintiffs seek

---

for which the member has waived pay from the United States."  32 U.S.C. § 101(19).  When
performing Title 32 FTNGD, the member may be supporting "operations or missions undertaken
by the member's unit at the request of the President or Secretary of Defense" (i.e., serving on
ADOS orders).  32 U.S.C. § 502(f)(2).

[4]  The Military Pay Act provides members of the Uniformed Services with an entitlement
to pay when the member: "(1) was on active duty, 37 U.S.C. § 204(a)(1) (1988); (2) was a
reservist who actually performed full-time duties, *id.* § 204(a)(2); (3) was a reservist on active
status who actually performed duties, 37 U.S.C. § 206(a)(1)-(2); or (4) was a reservist on
inactive status who would have performed duties but for disability, disease, or illness, 37 U.S.C.
§ 206(a)(3)."  *Huber v. United States*, 29 Fed. Cl. 260, 263 (1993); *see also Riser v. United
States*, 97 Fed. Cl. 679, 683 (2011) ("Military pay claims are divided into two categories: those
brought by 'service members serving on full-time active duty,' and those brought by 'persons not
in full-time active duty service," or, in other words, members of the reserves or National
Guard.").

relief under 10 U.S.C. § 1552, asking the Court to order the correction boards "to correct their military records and remove any adverse paperwork resulting from their vaccinated status or failure to comply with the rescinded and/or unlawful DoD Mandate."  *Id.* ¶ 344.

## III.   <u>Related Litigation</u>

RCFC 9(p) requires parties "[i]n pleading a claim that has been previously presented to another court, whether in whole or in part or directly or indirectly . . . [to] include a statement identifying the effect, if any, of the prior litigation on this court's subject matter jurisdiction."  At least three named plaintiffs in the present matter, Mr. Botello, Charles Hood, and Justin Phillips, have interests that are affected by other litigation: *Alvarado v Austin*, 22-cv-876 (E.D. Va.) and *Wilson v. Austin*, 22-cv-438 (E.D. Tex.).[5]

In *Alvarado*, a group of military chaplains from across the services sued the Government alleging that DoD established an unwritten "no accommodation" policy for religious objections to the vaccine.  *Alvarado*, ECF No. 1.  Relevant to this case, they alleged that the vaccine requirement, coupled with DoD's alleged treatment of RARs, violated RFRA.  After the suit was filed and transferred from the Middle District of Florida to the Eastern District of Virginia, Mr. Botello joined the suit as a plaintiff.  The district court subsequently dismissed the case due to a lack of subject-matter jurisdiction and because it found the plaintiffs' claims non-justiciable.  *Alvarado*, ECF No. 86.  The appeal from the district court's decision not to reconsider the dismissal was recently dismissed as moot by the United States Court of Appeals for the Fourth Circuit.  *Alvarado, et al. v. Austin, et al.*, No. 23-1419 (4th Cir. Aug. 3, 2023).  The Fourth

---

[5]  We note that in addition to the *Alvarado* and *Wilson* cases, there have been dozens of other cases filed in various district courts challenging the now-rescinded vaccination requirement.  We are only aware of two other cases in this Court raising such challenges: *Bassen v. United States*, No. 23-211 and *Harkins v. United States*, No. 23-1238.

Circuit remanded the case to the district court with directions to dismiss the case as moot, which it did on September 25, 2023. *Id.*

In *Wilson*, a group of plaintiffs from across the services, along with an "unincorporated association formed for this litigation 'Members of the Armed Forces for Liberty (MAFL),'" filed a class action complaint against the Government in the U.S. District Court for the Eastern District of Texas. *Wilson*, ECF No. 1 ¶ 4.  Relevant to this case, they claimed that the vaccination requirement violated 10 U.S.C. § 1107a.  Notably, two plaintiffs in this case—Mr. Hood and Mr. Phillips—have asserted they are members of the MAFL.

As explained further below, on September 8, 2022, over 700 individuals, including Mr. Hood and Mr. Phillips, filed a motion to intervene as plaintiffs in the *Wilson* matter.  *Wilson*, ECF No. 29.  In their intervention motion, the proposed intervenors explained that they were members of the MAFL and argued that they "sought status in this case from its inception under the auspices of FRCP Rule 17, which allows that 'a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws.'"  *Id.* at 20 (quoting FRCP 17(b)(3)(A)).  The *Wilson* case, along with the motion to intervene, was pending in the United States District Court for the Eastern District of Texas until September 1, 2023, when it was dismissed by the Court on the basis that the plaintiffs' claims were moot.

## STANDARD OF REVIEW

### I.   Subject-Matter Jurisdiction

Jurisdiction is a threshold matter, and "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (cleaned up). Under the Constitution, Congress is authorized to define the jurisdiction of the lower federal

courts and, once it has done so, limits on that jurisdiction may not be disregarded.  *Keene Corp. v. United States*, 508 U.S. 200, 207 (1993).

The jurisdiction of the Court of Federal Claims, like other Federal courts, is set by Congress, *see Aldinger v. Howard*, 427 U.S. 1, 15 (1976) ("federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress"), and is limited to claims where the United States has expressly waived its sovereign immunity from suit.  *United States v. Testan*, 424 U.S. 392, 399 (1976); *Booth v. United States*, 990 F.2d 617, 619 (Fed. Cir. 1993).  The waiver of sovereign immunity, and hence the consent to be sued, must be expressed unequivocally and cannot be implied.  *Testan*, 424 U.S. at 399.  In this Court, consent to suit is generally based upon the Tucker Act, 28 U.S.C. § 1491.  *Id.* at 397.  Pursuant to this statute, the United States waives sovereign immunity only for "claim[s] against the United States" that are "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).

While the Tucker Act provides the Court jurisdiction over a "claim against the United States founded either upon the Constitution, or Any Act of Congress," 28 U.S.C. § 1491(a)(1), "[n]ot every claim invoking the Constitution [or] a federal statute . . .  is cognizable under the Tucker Act.  The claim must be one for money damages against the United States."  *United States v. Mitchell*, 463 U.S. 206, 216 (1983).

To determine whether a claim is for money damages, the Court must inquire whether the substantive law on which it is based "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained," *id.* at 218, and is "reasonably amenable to the reading that it mandates a right of recovery in damage," *United States v. White Mountain Apache*

*Tribe*, 537 U.S. 465, 473 (2003).  Unless the plaintiff has made a nonfrivolous assertion that he is entitled to recover under a money-mandating source, the Court lacks jurisdiction.

Plaintiffs bear the burden of establishing by a preponderance of the evidence that the Court possesses subject-matter jurisdiction over their claims.  *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); RCFC 12(b)(1); *Visconi v. United States*, 98 Fed. Cl. 589, 590 (2011).  "In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff."  *Doe v. United States*, 106 Fed. Cl. 118, 122 (2012).  "If a motion to dismiss for lack of subject-matter jurisdiction challenges the truth of the jurisdictional facts alleged, the Court may consider relevant evidence outside the complaint when resolving the dispute."  *Allen v. United States*, No. 09-33304, 2023 WL 3737120, at *5 (Fed. Cl. May 31, 2023) (citing *Reynolds*, 846 F.2d at 474).

## II.     Failure to State a Claim Upon Which Relief Can Be Granted

A motion to dismiss pursuant to RCFC 12(b)(6) should be granted if the facts asserted in the complaint do not entitle the plaintiff to a legal remedy.  *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  RCFC 8(a)(2).  The factual allegations need to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In ruling on a motion to dismiss, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor."  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and the court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*,

11

556 U.S. 662, 678 (2009) (cleaned up).  "A motion to dismiss under [former] Rule 12(b)(4) for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not under the law entitle him to a remedy."  *Perez v. United States*, 156 F.3d 1366, 1370 (Fed. Cir. 1998) (citing *New Valley Corp. v. United States*, 119 F.3d 1576, 1579 (Fed. Cir. 1997)).

## ARGUMENT

Plaintiffs raise six claims in this Court, all of which should be dismissed for lack of jurisdiction or failure to state a claim.  First, plaintiffs allege that they are entitled to backpay under the Militia Clauses of Article III of the Constitution.  However, the Militia Clauses are not money-mandating. Therefore, plaintiffs' claim falls outside this Court's jurisdiction.

Second, plaintiffs allege that they are entitled to backpay under the NDAA.  However, the NDAA is not money-mandating and thus plaintiffs' request is beyond the Court's jurisdiction.  Even if the NDAA were money-mandating, plaintiffs' claim would still fail because the NDAA does not provide retroactive relief.

Third, plaintiffs allege a violation of the Military Pay Act, 37 U.S.C. §§ 204 and 206, resulting from the alleged curtailment of their FTNGD or ADOS orders or the prohibition against unvaccinated members performing National Guard duties.  They allege this curtailment and prohibition violated 10 U.S.C. § 1107a and the NDAA.  Once again, the NDAA provides the plaintiffs no basis for relief as it is not retroactive.  Further, plaintiffs have not alleged sufficient facts to show they suffered any harm in violation of 10 U.S.C. § 1107a and thus lack standing to bring that claim.

Fourth, plaintiffs allege a violation of the Military Pay Act resulting from the alleged curtailment of existing FTNGD or ADOS orders or the prohibition against unvaccinated

members performing National Guard duties. They allege this curtailment and prohibition

violated RFRA, 42 U.S.C. § 2000bb.  Because only two plaintiffs, Mr. Konie and Mr. Santos,

allege that they sought relief under RFRA, the remaining four plaintiffs fail to state a claim for a

RFRA violation.  Further, the Court lacks jurisdiction over Mr. Botello's claim based on a RFRA

violation because that claim was pending in another court when the complaint was filed.

Moreover, no plaintiff alleges he performed any duty for which he was not compensated.

Accordingly, each fails to state a claim for monetary entitlement under the Military Pay Act.

Thus, their claims under both counts III and IV should be dismissed for this independent reason.

Fifth, plaintiffs allege that the Government illegally exacted money from them through

"recoupment of separations pay, special pays, (re)enlistment bonus payments, post-9/11 GI Bill

benefits, costs of training and tuition at military schools or academies and public and private

universities, and travel and permanent change of station allowances."  Am. Compl. ¶ 339.

Reading plaintiffs' complaint in the light most favorable to them, the only discernable fact for

this allegation is the collection of Mr. Taylor's unpaid premiums for maintaining his SGLI

benefits.  However, he alleges no facts showing why recouping unpaid premiums is unlawful.

Accordingly, plaintiffs cannot state a claim for illegal exaction because none of the plaintiffs

pleaded any facts that the government unlawfully exacted money from them.

Finally, plaintiffs allege a violation of 10 U.S.C. § 1552.  Because 10 U.S.C. § 1552 is

not money-mandating, and plaintiffs assert no claims upon which the military record correction

boards could grant relief in any event, that claim should also be dismissed.

## I.     Plaintiffs' Claims Under Count I Fail Because The Militia Clauses Are Not Money-Mandating

Plaintiffs claim that the United States violated the Militia Clauses by allegedly

"withholding pay" from members of the National Guard, "prohibiting them from participating in

drill, training, and other duties," "involuntarily transferring them from active status to inactive status," and cancelling their "order to full-time active status."  Am. Compl. ¶¶ 258, 260. Borrowing substantially from the recent Fifth Circuit decision in *Abbott v. Biden*, 70 F. 4th 817 (5th Cir. 2023), plaintiffs assert that these actions constitute impermissible punishments by the Federal Government because the plaintiffs were not federalized.  *Id.*  In other words, plaintiffs argue that the United States took actions reserved to the states under the Militia Clauses.

As noted, however, this Court only has jurisdiction over violations of law, including the Constitution, that are money-mandating.  The plain reading of the Militia Clauses neither mandates compensation nor provides a right of recovery for damages.  The Militia Clauses provide:

> The Congress shall have Power . . .
>
> > To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;
> >
> > To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.

U.S. Const. Art. I, § 8, cls. 15, 16.

Despite the lack of any money-mandating language in the Militia Clauses, plaintiffs assert that they should be treated as money-mandating based on the Fifth Circuit's opinion in *Abbott v. Biden*.  Am. Compl. ¶¶ 101-22.  In *Abbott*, however, the Fifth Circuit did not address whether the Militia Clauses were money-mandating or whether they provide a basis for jurisdiction in this Court under the Tucker Act.  Rather, the Fifth Circuit held that the federal government cannot punish members of a state militia until they have been called into national

14

service.  Nothing in that decision supports plaintiffs' claim that the Militia Clauses "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell,* 463 U.S. 218; s*ee also* Am. Compl. ¶¶ 101-09.

Plaintiffs also rely on *Hatter v. United States*, 953 F.2d 626 (Fed. Cir. 1992) and *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1375 (Fed. Cir. 2000), in a failed attempt to latch the Militia Clauses to the Compensation Clause and the Export Clause.  *See* Am. Compl. ¶¶ 46, 119, 124-138, 247-253.  In *Hatter*, the Federal Circuit held that the Compensation Clause under U.S. Const. Art. III, § 1,[6] "fairly interpreted, mandates the payment of money in the event of a prohibited compensation diminution [for members of the judiciary]. . . .  This language presupposes damages as the remedy for a governmental act violating the compensation clause." 953 F.2d at 628.  The court also found "the history of the compensation clause supports [the] court's reading that a violation of the clause mandates repayment or compensatory damages." *Id.*  The framers of the Compensation Clause noted the importance of the clause to the "preservation of judicial independence in a system of separated powers," such that "judicial officers deprived of full compensation need not rely on legislative or executive action for a remedy."  *Id.*  The Federal Circuit concluded that the Compensation Clause is money-mandating because the "purpose of Article III, § 1, as well as its language, embraces a self-executing compensatory remedy."  *Id.* at 629.

In *Cyprus*, the Federal Circuit took the same analytical approach—it first found that the

---

[6]  The Compensation Clause states: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, *receive for their Services, a Compensation*, which shall not be diminished during their Continuance in Office."  U.S. Const. Art. III, § 1 (emphasis added).

Export Clause,[7] "when fairly interpreted, affords an independent cause of action for monetary remedies," and then concluded that "the polices underlying the Export Clause confirm [the court's] textual interpretation."  205 F.3d at 1373. Thus, the Federal Circuit reasoned that "the Export Clause's restriction on taxing power requires Congress to refund money obtained in contravention of the clause."  *Id.*

In short, the Federal Circuit determined that "both [the Compensation and the Export Clauses] protect pecuniary interests." *Id.* at 1376.  By contrast, nothing in the Militia Clauses reflects an intent to provide for a monetary remedy, much less the payment of money damages to *individual National Guard members* as the remedy for a violation. Because the Militia Clauses cannot be fairly interpreted as money mandating, the Court lacks jurisdiction to entertain plaintiffs' constitutional claim.

## II.   Plaintiffs' Claims Under Count II Fail Because The FY 2023 NDAA Is Not Money-Mandating, And The Plaintiffs Can Show No Violation Of The Statute

Plaintiffs' claims predicated on the FY 2023 NDAA similarly fail for lack of jurisdiction because that statute also is not money-mandating.  And even if this Court were to conclude that the FY 2023 NDAA is money-mandating, plaintiffs have not alleged a violation of the statute and the count should therefore be dismissed for failure to state a claim.

### A.   The NDAA Is Not Money-Mandating

Plaintiffs claim for backpay under the NDAA relies on the provision of the NDAA that states that "[n]ot later than 30 days after the date of the enactment of this Act, the Secretary of Defense shall rescind the mandate that members of the Armed Forces be vaccinated against COVID-19 pursuant to the memorandum dated August 24, 2021, regarding 'Mandatory

---

[7] The Export Clause states: "No Tax or Duty shall be laid on Articles exported from any State."  U.S. Const. Art. I, § 9, cl. 5.

Coronavirus Disease 2019 Vaccination of Department of Defense Service Members.'"  NDAA §

525.  The Court must look to the plain language of the statute to determine if it can fairly be

interpreted as mandating compensation.  *New York & Presbyterian Hosp. v. United States*, 881

F.3d 877, 882 (Fed. Cir. 2018).  Nothing in the language of section 525 can be interpreted as

mandating compensation for service members affected by the vaccination requirement

retrospectively or prospectively.  Indeed, the language does not contemplate, much less mandate,

any compensatory rights for service members.

Plaintiffs' claim that the NDAA is money-mandating appears to be based on their view

that it retroactively voided the vaccination requirement.  Am. Compl. ¶¶ 65–66, 272–74.  Even if

that were correct, which it is not (*see infra* section II.B), the NDAA would still not be money-

mandating.  Plaintiffs argue that "Congress chose" the term "rescind" "to restore Plaintiffs . . . to

the position in which they would have been in."  *Id.* ¶ 273.  But this language by itself does not

mandate monetary compensation or any other particular relief.

Moreover, where, as here, there are "strong indications that Congress did not intend to

mandate money damages," the Court should not find that a statute is money mandating absent an

express damages provision.  *White Mountain Apache Tribe*, 537 U.S. at 478.  On December 8,

2022, the House voted to pass the NDAA, which included the provision stating that "the

Secretary of Defense shall rescind the mandate that members of the Armed Forces be vaccinated

against COVID-19."  NDAA, § 525; *see* https://www.congress.gov/bill/117th-congress/house-

resolution/1512/text.  On December 15, 2022, even though the NDAA already included the word

"rescind," Senator Ron Johnson unsuccessfully proposed an amendment to require the military to

reinstate and provide backpay to members who were discharged "solely on the refusal of such

member to receive a vaccine for COVID-19," in order "to compensate [members who received

adverse action] for any pay and benefits lost as a result of such punishment."  S. Amdt. 6526 to

H.R. 7776, https://www.congress.gov/amendment/117th-congress/senate-amendment/6526/text.

Senator Johnson explained that NDAA section 525—with the word "rescind"—did not go "far

enough," and an amendment was needed that "allows the servicemember to be reinstated with

backpay if kicked out of the military solely for refusing the vaccine" and to "redress[] any other

types of adverse actions the DOD took against a servicemember for refusing the COVID-19

vaccine." Sen. Rec. Col. 168, Issue 195, page S7233.

https://www.congress.gov/117/crec/2022/12/15/168/195/CREC-2022-12-15-pt1-PgS7226.pdf.

Such an amendment would have been unnecessary if the word "rescind" already required

the military to provide the monetary relief the plaintiffs seek.  Senator Reed, who spoke in

opposition to the proposed amendment, likewise did not understand the word "rescind" to require

the remedies Plaintiffs seek.  Sen. Rec. Col. 168, Issue 195, page S7233–34 (noting that

additional legislation would be needed to "restore [the] benefits" of unvaccinated service

members).  The Senate ultimately rejected the amendment by a vote of 40 to 54.

https://www.congress.gov/amendment/117th-congress/senate-amendment/6526/actions.

Further, a month after the President signed the NDAA, 19 senators introduced the

Allowing Military Exemptions, Recognizing Individual Concerns About New Shows

(AMERICANS) Act of 2023.  Jan. 24, 2023, Sen. Cruz Press Release https://perma.cc/49PR-

SQ9Y.  Senator Cruz stated that the proposed AMERICANS Act "builds off of the [NDAA]"

and "includes measures not incorporated into the NDAA, including a requirement that the

Secretary of Defense offer reinstatement to service members who were fired over the military's

COVID-19 vaccine mandate."  *Id*.  Representative Dan Bishop, who has offered a companion

bill in the House, explained that "last year's NDAA . . . didn't provide any meaningful remedies

for servicemembers who were kicked out due to the mandate." *Id.* These statements reflect a collective understanding that the NDAA did not provide the remedies sought by Plaintiffs in this case.

Based on this history, the Court has strong indications that Congress did not intend the NDAA to provide monetary compensation to service members for either past or future losses. Thus, because the statute does not contain an express damages provision, the Court should find that it is not money-mandating and dismiss Count II as outside the Court's jurisdiction. *See White Mountain*, 537 U.S. at 478.

### B.     The NDAA Does Not Provide Retroactive Relief

Even if the NDAA did mandate compensation for future losses – which it does not – plaintiffs' claims still fail because the NDAA did not direct the Secretary of Defense to rescind the vaccine requirement retroactively—*i.e.*, to render it void from the moment it was adopted. Plaintiffs argue that the services violated the NDAA by failing to provide backpay following Congress's instruction to rescind the vaccination requirement.  Am. Compl. ¶ 274.  Plaintiffs plead they were all denied pay prior to the passage of the NDAA on December 23, 2022. *See id.* ¶¶ 16–24.  In other words, plaintiffs argue that all the harm they suffered is a consequence of the vaccination requirement in place between August 24, 2021 and the passage of the NDAA. Accordingly, in order to state a claim for violation of the NDAA, plaintiffs must establish that the NDAA's mandate applies retroactively.

Plaintiffs' entire theory of retroactivity hinges on their interpretation of Congress's intent behind its direction to the Secretary of Defense to "rescind" the Department's vaccine requirement.  Citing the Sixth Edition of Black's Law Dictionary, plaintiffs contend that rescind "means 'an annulling; avoiding, or making void; abrogation; rescission . . .'" and "Congress

chose this term to direct the Defendant Agencies and the courts to apply the rescission with full retroactive effect to restore Plaintiffs and other Active-Duty Service Members to the position in which they would have been in the absence of the unlawful DoD Mandate and implementation orders." *Id.* ¶¶ 65, 272–73. Plaintiffs are wrong.

This Court should not determine that Congress intended this statute to have retroactive effect unless Congress made such an intent clear. Plaintiffs must overcome the strong "presumption against retroactivity," which "the Supreme Court has made clear '[] is not favored in the law.'" *BP America Production Co. v. United States*, 148 Fed. Cl. 185, 195 (2020) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). The Court of Appeals for the Federal Circuit has held that it "will construe a statute to avoid retroactivity unless there is clear evidence that Congress intended otherwise." *Hicks v. Merit Sys. Prot. Bd.*, 819 F.3d 1318, 1321 (Fed. Cir. 2016). "The principle that legislation usually applies only prospectively 'is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.'" *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1607 (2020) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994)). Under "the principle against retroactive legislation, . . . courts read laws as prospective in application unless Congress has unambiguously instructed retroactivity." *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (citing *Landgraf*, 511 U.S. at 263); *Landgraf*, 511 U.S. at 272–73 (stating that courts presume a statute is not retroactive unless Congress provides "clear intent" otherwise). Congress has codified the presumption that laws only apply in the future and do not apply retroactively "to release or extinguish any" previously imposed consequence "unless the repealing Act shall so expressly provide." 1 U.S.C. § 109.

In short, there is abundant authority that this Court should only apply a statute

retroactively where the congressional intent to do so is clear.  Here, absent express congressional

intent, this Court should not presume that the NDAA authorizes retroactive relief to those

affected by the mandate while it was in effect.

Plaintiffs here argue a single word—"rescind"—shows a clear intent to make the NDAA

apply retroactively.  Am. Compl. ¶¶ 7, 65–66.  Relying on that one word and nothing more,

plaintiffs claim Congress evinced a clear intent to require the military to act as though the

vaccine mandate had never been adopted—including reinstating discharged service members,

awarding promotions, and providing backpay for failure to comply with the former COVID-19

vaccination requirement.  Am. Compl. ¶¶ 7, 65–66, 272–73.  But that word alone does not show

a clear intent that their requested relief should apply retroactively.

The current version of Black's Law Dictionary defines "rescind" when used in the phrase

to "rescind the legislation" as to "make void; to repeal or annul."  RESCIND, Black's Law

Dictionary (11th ed. 2019).  Merriam-Webster defines "rescind" as "to take away," to "remove,"

to "take back," to "cancel," or "to make void."  RESCIND, Merriam-Webster Dictionary,

https://www.merriam-webster.com/dictionary/rescind.  As these definitions reflect, the most

natural understanding of this term as used in the NDAA is that Congress intended the Secretary

to repeal or void the vaccine mandate prospectively.  Nothing in Congress' use of the term

"rescind," without more, supports a conclusion that the repeal of the mandate was intended to

apply retroactively.

Plaintiffs attempt to support their retroactivity argument by pointing to how the related

term "rescission" is sometimes used in contract law.  Am. Compl. ¶ 65 ("in the context of

*rescission* of a contract").[8]  But even in contract law, the "term 'rescission' is often used by lawyers, courts, and businessmen in many different senses."  RESCISSION, Black's Law Dictionary (11th ed. 2019).  In some cases, "rescission" means "an agreement by contracting parties to discharge all remaining duties of performance and terminate the contract."  *Id.*  In other situations, however, "rescission" means "unilaterally unmaking of a contract for legally sufficient reasons, such as the other party's material breach, or a judgment rescinding the contract."  *Id.*  And "rescission" can also refer to "a remedy or defense for a nondefaulting party and is accompanied by restitution of any partial performance, thus restoring the parties to their precontractual positions."  *Id.*  Plaintiffs appear to rely on this last definition of "rescission"—a remedy for a non-defaulting party to seek restitution for partial performance.  Am. Compl. ¶ 65.  However, plaintiffs are not non-breaching parties who have elected restitution for a material breach of a mutually agreed upon contractual arrangement.  In any event, Congress used the term "rescind" in the NDAA – not the distinct and more technical term "rescission" – and the plain and usual meaning of rescind when applied to legislation or a rule is that the legal provision no longer has prospective force.

The legislative history of the NDAA supports this plain reading of the statute.  As explained above, the Senate's consideration—and subsequent rejection—of Amendment 6526 to the NDAA and subsequent consideration of the AMERICANS Act strongly indicate that Congress did not intend to make the NDAA a vehicle for retroactive money damages or any other retroactive relief against the United States.

---

[8]  Plaintiffs' citation to Black's Law Dictionary (6th ed. 1990) is incomplete.  First Amend. Compl. ¶ 65.  The Sixth Edition does not independently define the word "rescind."  Plaintiffs instead cite to the definition for "Rescission of contract" but never identified the full legal phrase they were defining or reveal that they were citing to that contract-law-specific definition.  RESCISSION OF CONTRACT, BLACK'S LAW DICTIONARY (6th ed. 1990).

In sum, plaintiffs have failed to overcome the strong presumption that laws be read as prospective in application, particularly given the NDAA's applicable legislative history.  Thus, plaintiffs have failed to establish that the NDAA required retroactive rescission of the vaccination requirement, and Count II should also be dismissed for failure to state a claim.

**III.    Plaintiffs' Claims Under Count III Fail Because Plaintiffs Lack Standing And Otherwise Fail To State A Claim**

Under Counts III and IV, plaintiffs allege that they were wrongfully denied pay under the Military Pay Act because the vaccination requirement violated the NDAA, 10 U.S.C. § 1107a, and RFRA.  Am. Compl. ¶¶ 291–319, 320–34.  As we demonstrate in this Section and in Section IV, the Court lacks jurisdiction to entertain some of the plaintiffs' claims under these counts.  But even if the Court possessed jurisdiction to entertain all of the plaintiffs' claims under the Military Pay Act, all of those claims would still have to be dismissed for failure to state a claim because none of the plaintiffs performed work for which he was entitled to be paid.  *See infra* Section V.

Turning to Count III, as an initial matter, plaintiffs' claim that they were wrongfully denied military pay based on a violation of the NDAA fails for the reasons noted above.  The NDAA did not require any retroactive action, and thus plaintiffs' claim that they are entitled to backpay due to a violation of the NDAA must be dismissed for failure to state a claim.

Further, plaintiffs lack standing to pursue their claims based on 10 U.S.C. § 1107a and also fail to state a claim for a violation of this provision.[9]  Section 1107a, which sets forth certain conditions for emergency use products, provides that the President may waive a service

---

[9]  As explained below, plaintiffs also fail to state a claim under the Military Pay Act because they do not allege that they performed duty for which they were not paid.  *See infra* Section V.

member's right to refuse a product authorized for emergency use "if the President determines, in writing, that complying with such requirement is not in the interests of national security." 10 U.S.C. § 1107a.

Plaintiffs argue that DoD "mandated unlicensed [Emergency Use Authorization (EUA)] COVID-19 vaccines," and that section 1107a prohibits the military from mandating any service member to take an unlicensed EUA vaccine absent an express Presidential authorization. Am. Compl. ¶¶ 205–10, 212. Their theory is that "DoD did not have any FDA-licensed COVID-19 vaccines" when the vaccination requirement was instituted, and thus the only way that they could receive a vaccination is by receiving an unlicensed EUA vaccine. Id. ¶¶ 198–200.

Under the facts pled, plaintiffs lack standing to pursue this claim. To invoke this Court's jurisdiction, a plaintiff must establish standing under Article III of the Constitution. *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003). To demonstrate standing, a plaintiff must satisfy three elements. *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003). First, "the plaintiff must allege that it has suffered an 'injury in fact—an invasion of a legally protected interest." *Id.* Second, "there must be a causal connection between the injury and the conduct complained of." *Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

Here, based on the facts as pled, plaintiffs have not established a causal connection between their injury, their alleged entitlement to backpay, and the conduct they complain of. Even accepting as true plaintiffs' allegation that DoD only had unlicensed EUA vaccines available, nothing in the mandate required that plaintiffs receive those unlicensed vaccines. To the contrary, the vaccination mandate required that service members receive only "COVID-

vaccines that receive full licensure . . . in accordance with FDA-approved labeling and guidance," ECF No. 1-2 at 1, and permitted service members to obtain a fully licensed vaccine from a commercially available source.  Critically, plaintiffs do not allege that they were prevented by the Government from receiving a fully licensed vaccine from such a source. Instead, they entirely fail to address commercial sources of the vaccine. As a result, plaintiffs cannot show that their denial of pay was causally connected to the conduct complained of – that DoD only possessed unlicensed vaccines.[10]  Instead, plaintiffs elected not to receive a COVID-19 vaccine despite the option to receive it from a fully licensed source, and thus their alleged failure to receive backpay was not caused by any asserted violation of 10 U.S.C. § 1107a.

To be sure, plaintiffs add an allegation in their amended complaint that "[n]o FDA-licensed COVID-19 vaccines were available at all at the time that the August 24, 2021 Mandate was issued."  Am. Compl. ¶ 299.  Assuming that allegation was meant to encompass commercially available sources, it fares no better.  The earliest that any plaintiff alleges he was denied pay was September 13, 2021.  *Id.* ¶ 16.  Accordingly, whether FDA-licensed vaccines were available on August 24, 2021, is irrelevant to plaintiffs' claims, because plaintiffs suffered no adverse action at that time.

For similar reasons, plaintiffs also fail to state a claim that the vaccination requirement violated 10 U.S.C. § 1107a.  As noted, DoD's now-rescinded vaccination policy did not require service members to take a vaccine authorized only for emergency use and thus did not even implicate, let alone violate, section 1107a.  The policy was clear:  service members were required

---

[10]  Indeed, as part of the *Wilson* case, the services offered to administer fully licensed and labeled vaccines to all willing plaintiffs, including members of the MAFL, which included Mr. Hood and Mr. Phillips.  *Wilson*, ECF No. 14-26.  Neither Mr. Hood nor Mr. Phillips (nor any other individuals in *Wilson*) accepted that offer.  *See Wilson*, ECF No. 14 at 23-24.

to receive only "COVID-19 vaccines that receive full licensure . . . in accordance with FDA-approved labeling and guidance." ECF No. 1-2 at 1. Plaintiffs do not and cannot dispute that the requirement was limited to COVID-19 vaccines that received full licensure.

Plaintiffs try to muddy the waters by alleging what type of vaccine doses DoD had and when. But those allegations fail to establish that plaintiffs were required to use unlicensed vaccines, given that the vaccination requirement did not limit plaintiffs or any service members to taking only those vaccines in DoD's possession. Thus, service members were permitted to obtain commercially available and fully licensed vaccine doses of their choice (which many service members did) to satisfy the requirement. Accordingly, even if DoD only had unlicensed vaccines available, as plaintiffs allege, DoD's policy did not violate 10 U.S.C. § 1107a because DoD did not require service members to take those vaccines. Thus, plaintiffs have not stated a claim for relief under 10 U.S.C. § 1107a.

## IV. Plaintiffs' Claims Under Count IV Fail Because Four Plaintiffs Fail To State A Claim, While One Plaintiff Suffers From A Section 1500 Defect

Under Count IV, plaintiffs again allege that they were wrongfully denied military pay under the Military Pay Act, this time based on a violation of RFRA, 42 U.S.C. § 2000bb.[11] Am. Compl. ¶¶ 320–34. Like their claims under Count III, most plaintiffs fail to state a claim for wrongfully denied military pay under the Military Pay Act based on a violation of RFRA. Further, Mr. Botello's claim is outside the Court's jurisdiction under 28 U.S.C. § 1500.

---

[11] To the extent that plaintiffs ask this Court to read their claims in Count IV as stand-alone RFRA claims unrelated to the Military Pay Act, such claims would fall outside this Court's jurisdiction because RFRA "does not provide a damages remedy or waive the government's sovereign immunity with respect to a claim for damages." *Klingenschmitt v. United States*, 119 Fed. Cl. 163, 184-85 (2014).

A.    <u>**Four Of The Six Plaintiffs Fail To State A Claim**</u>

Plaintiffs allege that the services violated RFRA by "systematically denying" RARs. *Id.* ¶ 327. However, only two plaintiffs—Mr. Konie and Mr. Santos—have pleaded that they submitted an RAR. *Id.* ¶¶ 17, 20. None of the four remaining plaintiffs alleges that any submitted an RAR or had an RAR denied. *Id.* ¶¶ 16–24. Accordingly, those four plaintiffs fail to state a claim for a violation of RFRA.[12]

Department of Defense Instruction (DoDI) 1300.17, "Accommodation of Religious Practices Within the Military Services," allows service members to submit an RAR to request that they be exempted from certain policies, practices, or duties on religious grounds. DoDI 1300.17 § 3.1(a); *see also* Am. Compl. ¶ 214. In order to allege a RFRA violation, plaintiffs must allege that the challenged policy substantially burdened their sincerely held religious belief. 42 U.S.C. § 2000bb-1; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014). The four plaintiffs who did not submit RARs do not allege facts showing the vaccination requirement burdened any sincerely held religious belief when they did not attempt to obtain an accommodation and pleaded no basis on which it would have burdened them to seek an accommodation. Indeed, because the basis of their claims is that the services wrongfully denied their RARs, the facts asserted do not entitle them to any relief. *Perez*, 156 F.3d at 1370.

Moreover, those plaintiffs who voluntarily chose not to avail themselves of the RAR

---

[12]    Even Mr. Konie and Mr. Santos make only conclusory allegations that the vaccination requirement violated RFRA, which is insufficient to state a claim. *See Twombly*, 550 U. S. at 555 (a pleading must do more than just offer "a formulaic recitation of the elements of a cause of action"). Indeed, they do not allege any facts suggesting they harbored any sincerely held religious belief that was unduly burdened by the vaccine requirement as required under the RFRA standard. However, because plaintiffs cannot state a claim under the Military Pay Act, *see infra* Section V, the Court need not reach the issue of whether they have alleged sufficient facts to make out a prima facia RFRA claim.

process fail to state a claim because they requested or assented to the consequences from which they now seek relief.  It is well-settled that voluntary separation actions are not the basis for viable claims for relief in this Court.  *See Metz v. United States*, 466 F.3d 991, 1000 (Fed. Cir. 2006); *Tippett v. United States*, 185 F.3d 1250, 1255 (Fed. Cir. 1999) (applying the rule to a servicemember's request for discharge); *Thomas v. United States*, 42 Fed. Cl. 449, 452 (1998) ("[C]laims for post-retirement relief following a voluntary retirement must be denied for failure to state a claim upon which any court can grant relief.").  When assessing the voluntariness of a servicemember's discharge, this Court applies an objective standard based on all the facts and circumstances; the individual's subjective perception is not controlling.  As this Court has held,

> [e]xternal events and conditions, rather than subjective impressions or perceptions, must guide the court's focused inquiry. Involuntariness, therefore, is not determined by the fact that an individual subjectively perceived no choice in deciding to retire earlier when, in fact, he truly had an option. Rather, what is determinative as to voluntariness is whether such individual did in fact have a choice, notwithstanding the undesirability of the alternatives available.

*Longhofer v. United States*, 29 Fed. Cl. 595, 601 (1993).  Applying this standard in the context of a claim of duress or coercion, a plaintiff "must demonstrate that: (1) he involuntarily accepted the terms of the government; (2) circumstances permitted no other alternative; and (3) said circumstances were the result of the government's coercive acts."  *Carmichael v. United States*, 298 F.3d 1367, 1372 (Fed. Cir. 2002).  None of the requirements for overcoming a presumption of voluntariness is met in this pleading.  Plaintiffs plead no facts suggesting they were coerced into not filing accommodation requests or that they did not understand the effect on their full-time orders and ability to drill if they remained unvaccinated without filing an accommodation request.

When plaintiffs declined to seek an accommodation, they did so with the clear

understanding that they were effectively asking their respective services to take administrative actions against them despite the availability of alternative relief. They therefore *voluntarily* accepted the consequences of remaining unvaccinated, which extended to travel restrictions, removal from full-time orders, and exclusion from attending their unit's drills and earning pay and points, among others. They took no steps to avoid the consequences of which they now complain, even though there were alternatives available for those who harbored religious objections to the vaccine mandate. At bottom, plaintiffs cannot complain of a RFRA violation in this Court after failing to avail themselves of the opportunities to assert such a violation before their respective services.

For these reasons, the claims of four of the six plaintiffs in Count III should be dismissed for failure to state a claim.[13]

## B. The Court Lacks Jurisdiction Over Mr. Botello's Claim Under 28 U.S.C. § 1500

In addition to the issues discussed above, Mr. Botello's claim under Count IV should be dismissed for an independent jurisdictional reason: his claim was pending in district court when he filed his complaint in this case. 28 U.S.C. § 1500.

By statute, this Court cannot exercise jurisdiction over "any claim for or in respect to which the plaintiff . . . has pending in any other court any suit . . . against the United States or any person who, at the time when the cause of action . . . arose, was . . . acting . . . directly or indirectly under the authority of the United States." 28 U.S.C. § 1500. "To determine whether § 1500 applies, a court must make two inquiries: (1) whether there is an earlier-filed suit or

---

[13] Again, as discussed below, none of the plaintiffs, including Mr. Konie and Mr. Santos, states a claim under the Military Pay Act because none alleges he performed duty for which he was not paid. *See infra* Section V. Accordingly, Mr. Konie's and Mr. Santo's claims under RFRA also fail even though they allege they each submitted an RAR.

process pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed

case are for or in respect to the same claim(s) asserted in the later-filed Court of Federal Claims

action." *Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013) (cleaned up); *see also*

*United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011).  Section 1500 suggests a

broad prohibition against multiple suits and is not to be construed narrowly.  *Trusted Integration,*

*Inc. v. United States*, 659 F.3d 1159, 1164 (Fed. Cir. 2011).

      As noted above, on May 18, 2022, a group of military chaplains from across the services

filed suit in the U.S. District Court for the Middle District of Florida alleging that DoD

established an unwritten "no accommodation" policy for religious objections to the vaccine.

*Alvarado*, ECF No. 1.  Like the claims at issue in this case, the *Alvarado* plaintiffs alleged,

among other things, that the vaccination requirement and DoD's alleged policy of denying RARs

violated RFRA.  *Id.* ¶¶ 189–205.  After the case was transferred to the Eastern District of

Virginia, a group of individuals, including Mr. Botello, moved to join the proceedings on August

14, 2022.  *Alvarado*, ECF No. 56; *see also*, ECF No. 56-4, Decl. of Army Chaplain (Captain)

Jeremiah Botello.  The district court granted their joinder motion on September 19, 2022.

*Alvarado*, ECF No. 68.

      Even though the district court dismissed the complaint on November 23, 2022, the case

was pending at the United States Court of Appeals for the Fourth Circuit, *Alvarado v. Austin*, No.

23-1419 (4th Cir.), at the time the instant action was filed.  "A suit is pending for purposes of

section 1500 until its final adjudication on appeal or until the time for appeal has run."  *Prophet*

*v. United States*, 106 Fed. Cl. 456, 465 (2012) (cleaned up).  Likewise, "[t]he subsequent

dismissal of all or any part of the district court suit prior to the filing or resolution of a motion to

dismiss in this court does not affect the analysis."  *Capelouto v. United States*, 99 Fed. Cl. 682,

694 (2011).  Accordingly, Mr. Botello's claim was pending in a different court when he first

filed his claim in this Court on February 8, 2023, and this Court lacks jurisdiction.  28 U.S.C.

§ 1500.

**V.      Plaintiffs Are Not Entitled To Any Relief Under The Military Pay Act And Thus Fail To State A Claim Under Counts III and IV**

In their complaint, plaintiffs allege that they are entitled to "back pay and other ancillary

relief" after they were allegedly wrongfully denied pay for failing to comply with the COVID-19

vaccination requirement.  Am. Compl. ¶ 1.  As explained above, plaintiffs' allegations that they

are entitled to compensation under the Militia Clauses or the NDAA fail to invoke a money-

mandating authority and must be dismissed for lack of jurisdiction.  Under Counts III and IV,

plaintiffs allege that they were improperly denied pay under the Military Pay Act, which is

money-mandating.  *Id.* ¶¶ 291-319, 320-34.  They allege they are entitled to backpay under the

Military Pay Act due to violations of the NDAA, 10 U.S.C. § 1107a, and RFRA.[14]  As explained

above, however, those claims should be dismissed because the latter statutes were not violated.

*See supra* Section I.B, Section II.A, Section III.A.

In addition to the reasons stated above, Counts III and IV should be dismissed because

plaintiffs also fail to state a claim for which they can be granted relief under the Military Pay

Act.  The Federal Circuit construes the Military Pay Act to mandate the payment of unpaid

backpay in only four circumstances: where a plaintiff "(1) was on active duty, 37 U.S.C.

§ 204(a)(1) (1988); (2) was a reservist who actually performed full-time duties, *id.* § 204(a)(2);

---

[14]  We understand Count I to be asserting a stand-alone claim for a violation of the Militia Clauses.  Even if plaintiffs attempted to allege they are entitled to backpay under the Military Pay Act due to an alleged violation of the Militia Clauses, they would fail to state a claim for the reasons set forth below.

(3) was a reservist[15] on active status who actually performed duties, 37 U.S.C. § 206(a)(1)-(2); or (4) was a reservist on inactive status who would have performed duties but for disability, disease, or illness, 37 U.S.C. § 206(a)(3)."  *Huber*, 29 Fed. Cl. at 263.  Because no plaintiff alleges he falls into any of these categories – in particular that he did not receive any pay he earned – none of the plaintiffs state a claim under the Military Pay Act.

Mr. Taylor alleges that he was "prohibited from" performing Title 32 training and other duties otherwise payable under 37 U.S.C. § 206(a)(1) & (2) in the third *Huber* category.  Am. Compl. ¶ 24.  But Mr. Taylor does not allege that he was not paid for duty performed.  In *Dehne v. United States*, the Federal Circuit held that 37 U.S.C. § 206 mandates pay only "for each regular period of instruction, period of appropriate duty, at which the member is *engaged* at least two hours," or "for the *performance* of such other equivalent training, instruction, duty, or appropriate duties as the Secretary may prescribe."  970 F.2d 890, 893 (Fed. Cir. 1992) (emphasis added).  "Because entitlement to pay under 37 U.S.C. § 206(a)(1) & (2) is contingent on performance of duty it does not mandate pay when a member fails to perform his duties 'whether the failure to drill was by election of the member, or by decision of the service involved.'"  *Pohanic v. United States*, 48 Fed. Cl. 166, 167-68 (2000) (quoting *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999)).  Mr. Taylor cannot state a claim upon which relief can be granted for backpay because he did not perform National Guard duty during the time period in question.  The remaining plaintiffs' claims share the same fate.

---

15   The term "reservist" encompasses both members of the Reserve component and members of the National Guard.  *See Riser*, 97 Fed. Cl. at 683 ("Military pay claims are divided into two categories: those brought by 'service members serving on full-time active duty,' and those brought by 'persons not in full-time active duty service," or, in other words, members of the reserves or National Guard.").

Mr. Botello,[16] Mr. Hood, Mr. Santos, and Mr. Phillips assert that they meet the requirements of the Military Pay Act because their FTNGD orders issued under 32 U.S.C. § 502(f) made them effectively active- duty service members[17]  However, FTNGD orders are not "active duty" military service as defined in 10 U.S.C. § 101(d)(1).  Instead, 37 U.S.C. § 204(d) authorizes reservists with such orders to be paid as if they were active-duty service members under 37 U.S.C. § 204(a)(1) for the limited purpose of calculating Federal pay and related benefits.  *See* 37 U.S.C. § 204(d) ("Full-time training, training duty with pay, or other full-time duty performed by a member of the Army National Guard of the United States or the Air National Guard of the United States in his status as a member of the National Guard, is active duty for the purposes of this section"); *see also Pohanic*, 48 Fed. Cl. at 168 (explaining that full-time duty performed by a National Guard member is authorized for pay under 37 U.S.C. § 204(a)(1) per 37 U.S.C. § 204(d)).  "However, 37 U.S.C. § 204(d) (1994), like 37 U.S.C.

---

[16]  Not only does Mr. Botello fail to state a claim under the Military Pay Act, but he lacks standing to pursue *any* of his claims because he suffered no injury from the vaccination requirement.  He pleads "he was removed from and dropped from his orders and active status on September 13, 2021" and "he was placed on 'no points/no pay status' on December 17, 2021." Am. Compl. ¶ 16.  In reality, Mr. Botello was on one set of active orders that ended on September 13, 2021, and was ordered again to active duty immediately on September 14, 2021, to attend chaplain and basic officer leadership training through December 16, 2021.  Appx17-20. He does not allege he was not paid for this duty.  In 2022, he drilled for pay and points regularly. He earned 42 of a possible 48 drill points and 15 participation points for a total of 57 points for the year.  Appx21.  In short, Mr. Botello has no injury that is redressable by this Court under the Military Pay Act.  He did not experience the harm he alleges.  He completed more than seven months of full-time National Guard duty in 2021 and drilled throughout 2022 before the COVID-19 vaccine mandate was rescinded in January 2023.  Accordingly, he experienced no injury in fact and cannot establish he has standing to seek relief from this court.  *See Paradise Creations, Inc.* 315 F.3d at 1308.

[17]  Mr. Phillips alleged that he was on ADOS order without specifying whether his ADOS orders were issued under Title 32 or Title 10 authority.  Am. Compl. ¶¶ 22–23.  However, plaintiffs claim that all plaintiffs were on "FTNGD, ADOS, AGR or other Title 32 'active duty; orders, or other full-time duty . . . in [their] status as a member of the National Guard'" authorized for pay under 37 U.S.C. § 204(a)(1), (2).  Am. Compl. ¶¶ 310. Thus, we understand that plaintiffs allege that Mr. Phillips's ADOS order was issued under 32 U.S.C. § 502(f).

§ 206(a)(1) & (2), limits [] entitlement to pay [] for duties *performed*." *Pohanic*, 48 Fed. Cl. at 168 (emphasis in original).

Like the claims raised by Mr. Botello, Mr. Hood, Mr. Santos, and Mr. Phillips, *Pohanic* involved a backpay claim brought by a National Guard member whose FTNGD order—issued by the Governor of Colorado under 32 U.S.C. § 502(f) authority—was terminated because the National Guard plaintiff violated a no-smoking policy. *Pohanic*, 48 Fed. Cl. at 166–67. While the Court found subject matter jurisdiction under the Tucker Act, the Court nevertheless concluded that "entitlement to pay [was] predicated on performance of duties" and thus the serviceman could not state a claim for backpay for duties not performed, whether the lack of performance was voluntary or involuntary. *Id*. at 167 (citing *Palmer*, 168 F.3d at 1314). Here, none of the plaintiffs alleges that he did not receive pay he earned under 37 U.S.C. § 204(a)(1). Instead, Mr. Botello, Mr. Hood, Mr. Santos, and Mr. Phillips each challenge not being permitted to earn pay under 37 U.S.C. § 204(a)(1), which is insufficient to state a claim for backpay. *Id*. at 168.

Finally, Mr. Konie's claim also fails. Mr. Konie does not claim a loss of income based on curtailed FTNDG orders or missed drills; instead, he alleges he suffered monetary damage based on an unrealized promotion. Am. Compl. ¶ 17. It is well-settled, however, that the Military Pay Act "ordinarily does not give rise to a right to the pay of the higher rank for which the plaintiff was not selected. . . . This is so because, generally, 'a service member is entitled only to the salary of the rank to which he is appointed and in which he served.'" *Antonellis v. United States*, 723 F.3d 1328, 1333 (Fed. Cir. 2013) (quoting *Smith v. Sec'y of the Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004)). The Federal Circuit has recognized two exceptions when backpay may be available in the promotion context: (1) "when the plaintiff 'has satisfied all the

legal requirements for promotion, but the military has refused to recognize his status;" and (2)

"when a decision not to select a plaintiff for promotion leads to his compulsory discharge." *Id*.

at 1333.  Mr. Konie does not satisfy these exceptions.  He concedes that he is not eligible for

promotion because he has not completed the Senior Leaders Course, which is a requirement for

promotion.  Am. Compl. ¶ 17.  Given that he alleges that he is still a member of the Illinois

Army National Guard, he also has not been involuntarily separated from the Illinois Army

National Guard.  *Id*.  Accordingly, like the other plaintiffs, Mr. Konie has also failed to state a

claim under the Military Pay Act.

In sum, none of these plaintiffs alleges the United States failed to pay him for any duty he

actually performed.  *See* Am. Compl. ¶¶ 16–18, 20, 22, 24.  To be sure, plaintiffs allege that they

*would have* performed duties but for their vaccination status.  *Id*.  But a service member cannot

state a claim for backpay for unperformed duties "even where the lack of performance was

involuntary and improperly imposed."  *Reilly v. United States*, 93 Fed. Cl. 643, 649 (2010).

Indeed, when a reservist or member of the National Guard is "wrongfully removed from" their

service, they have "no lawful claim against the United States for" unperformed service.  *Palmer*,

168 F.3d at 1314.  Accordingly, plaintiffs' claims under Counts III and IV fail even if they could

otherwise plead a violation of the NDAA, 10 U.S.C. § 1107a, or RFRA because plaintiffs have

no entitlement to backpay under the Military Pay Act.

## VI.    Plaintiffs' Claims For Illegal Exaction Under Count V Fail Because Plaintiffs Do Not Allege Any Money Was Illegally Exacted From Them

Under Count V, Plaintiffs claim that the Government "punished" them "through the

illegal exaction and recoupment of separations pay, special pays, (re)enlistment bonus payments,

post-9/11 GI Bill benefits, costs of training and tuition at military schools or academies and

public and private universities, [and] travel and permanent change of station allowances."  Am.

Compl. ¶ 339.  Plaintiffs' illegal exaction claim should be dismissed for lack of jurisdiction and failure to state a claim because they fail to allege that five of six plaintiffs actually experienced such exaction or recoupment, and that any suffered an illegal exactment.

"[A]n illegal exaction occurs . . . when the 'plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum' that was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'"  *Virgin Islands Port Authority v. United States*, 922 F.3d 1328, 1333 (Fed. Cir. 2019) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)).  "[T]o establish Tucker Act jurisdiction for an illegal exaction claim, a party that has paid money over to the government and seeks its return must make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation."  *Boeing Company v. United States,* 968 F.3d 1371, 1383 (Fed. Cir. 2020).  Where no violation of law is identified, there is no illegal exaction claim.  *E.g., Virgin Islands,* 922 F.3d at 1333–34 (holding that agency acted within its legal authority).

Here, the only allegation that the Government took money from any plaintiff comes from Mr. Taylor, who alleges that the Government recouped seven months of SGLI premiums that he did not pay while he was prohibited from drilling due to his unvaccinated status.[18]  Am. Compl. ¶ 24.

By its own terms, Mr. Taylor's allegation that he owed the Government back premiums

---

[18]  SGLI is a low-cost, term life insurance program administered by the Department of Veterans Affairs that is available to eligible service members. *See* https://www.va.gov/life-insurance/options-eligibility/sgli/ (last accessed September 19, 2023).  This is an optional benefit program and service members must elect to participate in it.  Premium payments are deducted from the pay of any member who elects coverage.

for his life insurance does not state a claim for illegal exaction.  Instead, the complaint indicates that he accrued indebtedness that the Government recouped in the amount of about $60.  *See id.* Mr. Taylor does not allege that he disputes the premiums for his SGLI coverage or allege those premiums were illegally collected from him.  He does not challenge the contractual basis for his requirement to pay SGLI premiums, which resulted from his election of SGLI coverage. Accordingly, Taylor does not state a claim for illegal exaction upon which relief may be granted.

The complaint includes no other allegations that the government took money from any plaintiffs that they seek to have returned.  *See* Am. Compl. ¶¶ 16–25.  The complaint lists a variety of pecuniary benefits that plaintiffs speculate *could be* recouped by the Government and might form the basis of an illegal exaction claim, but no plaintiff alleges that any such exaction occurred.  *See* Am. Compl. ¶ 243.  Without a payment to the Government that the remaining plaintiffs seek to have returned, this Court also lacks jurisdiction over their illegal exaction claims.  *Boeing,* 968 F.3d at 1383.

Further, even if the complaint could be construed to contain allegations that money was taken from each of the plaintiffs, their pleading still fails to state a claim.  They argue any such exaction was illegal based on the NDAA's instruction for the vaccine requirement to be rescinded.  As we have explained, *see supra* Section I.B, the NDAA does not entitle plaintiffs to any retroactive relief.  Because the NDAA did not instruct DoD to provide retroactive relief, any exaction that took place would not run afoul of the statute.  Accordingly, Plaintiffs fail to state a claim that any money was illegally exacted, and their claims under Count V should be dismissed.

**VII.  Plaintiffs' Claims Under Count VI Fail Because 10 U.S.C. § 1552 Is Not Money-Mandating And Plaintiffs Have Not Otherwise Pled A Claim Entitling Them To Relief From The Correction Boards**

Under Count VI, plaintiffs invoke 10 U.S.C. § 1552 for correction of their military records and removal of any adverse actions from their records.  Am. Compl. ¶¶ 342-45.  However, this statute does not provide the Court with jurisdiction because it is not money-mandating.  *Martinez v. United States*, 333 F.3d 1295, 1315 (Fed. Cir. 2003) ("section 1552 is not the 'money-mandating' statute that gives rise to the cause of action that provides the basis for a Tucker Act suit in the Court of Federal Claims"); *see also Visconi v. United States*, 98 Fed. Cl. 589 (2011), *aff'd*, 455 F. App'x 986 (Fed. Cir. 2012).  Neither does it provide them with any cause of action for which plaintiffs could recover damages under the Tucker Act.  Accordingly, to the extent plaintiffs attempt to assert stand-alone claims under section 1552, those claims should be dismissed as beyond this Court's jurisdiction.

Moreover, plaintiffs "seek an order from the Court directing the appropriate BCMR to correct their military records and remove any adverse paperwork resulting from their unvaccinated status or failure to comply" with the vaccination requirement.  Am. Compl. ¶ 344.  "Although the court has jurisdiction to order the correction of military records, it may only do so as 'incident of and collateral to [an] award of a money judgment.'"  *Visconi*, 98 Fed. Cl. at 595 (quoting *Voge v. United States*, 844 F.2d 776, 781 (Fed. Cir. 1988)).  Plaintiffs ask the Court to direct the correction of military records beyond a correction incident to a money judgment, which is beyond the Court's jurisdiction.  Essentially, plaintiffs' sixth claim asks the Court to do what plaintiffs are free to do on their own: direct their requests for records correction to their respective service boards.

Finally, to the extent that plaintiffs are merely asking the Court to direct the correction boards to correct their records to reflect their entitlement to backpay based on the other claims in their complaint, we have shown why each of those claims fail.  Thus, this claim, too, should be dismissed.

<div align="center">

**<u>CONCLUSION</u>**

</div>

For these reasons, we respectfully request that the Court dismiss this case for lack of subject-matter jurisdiction and for failure to state a claim upon which relief may be granted.

<div style="margin-left: 40%;">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

<u>s/ William J. Grimaldi</u>
WILLIAM J. GRIMALDI
Assistant Director

</div>

OF COUNSEL:

HOLLY K. BRYANT
Litigation Attorney
U.S. Army Legal Service Agency

JENNY L. NAYLOR
Lieutenant Colonel, Judge Advocate
Litigation Attorney
National Guard Bureau, Office of the General
Counsel


Dated: September 29, 2023

<u>s/ Kyle S. Beckrich</u>
KYLE S. BECKRICH
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-9322
Fax: (202) 305-7644
Kyle.Beckrich@usdoj.gov

Attorneys for Defendant

# <u>APPENDIX</u>

### <u>TABLE OF CONTENTS</u>

Guidance of Implementing Rescission of August 24, 2021 and November 30, 2021 Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces, Deputy Secretary of Defense (Feb. 24, 2023)................................................................................ Appx1

Army Policy Implementing the Secretary of Defense Coronavirus Disease 2019 (COVID-19) Vaccination Mandate Rescission, Secretary of the Army (Feb. 24, 2023)  .................... Appx3

Department of the Air Force (DAF) Guidance on Removal of Adverse Actions and Handling of Religious Accommodation Requests, Secretary of the Air Force (Feb. 24, 2023).......... Appx9

Department of the Navy Actions to Implement Coronavirus Disease 2019 Vaccine Rescission, Secretary of the Navy (Feb. 24, 2023) ........................................................................ Appx12

Return of Non-Federalized T32 National Guard Service Members to Non-Federalized Title 32 Pay, Chief, National Guard Bureau (Jan. 18, 2023).................................................... Appx14

Updated National Guard Bureau Official Coronavirus Disease 2019 Travel Guidance, Vice Chief, National Guard Bureau (Feb. 3, 2023).............................................................. Appx15

Jeremiah Botello Orders (Apr. 27, 2021, Aug. 18, 2021, Aug. 24, 2012) ......................... Appx17

Jeremiah Botello Retirement Accounting Statement (May 8, 2023).................................. Appx21



**DEPUTY SECRETARY OF DEFENSE**
**1010 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1010**

FEB 2 4 2023

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
            COMMANDERS OF THE COMBATANT COMMANDS
            DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT:  Guidance for Implementing Rescission of August 24, 2021 and November 30, 2021
           Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed
           Forces

        In today's rapidly changing global security environment, vaccines continue to play a
critical role in assuring a ready and capable force that is able to rapidly deploy anywhere in the
world on short notice. Department leadership is committed to ensuring the safety of our Service
members and will continue to promote and encourage vaccinations for all Service members
along with continued use of other effective mitigation measures. This includes monitoring
changing public health conditions, relevant data, and geographic risks; and updating policies and
processes as required to maintain the strategic readiness of our forces and our ability to defend
national security interests around the globe.

        This memorandum provides additional guidance to ensure uniform implementation of
Secretary of Defense Memorandum, "Rescission of the August 24, 2021 and November 30, 2021
Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces,"
January 10, 2023 (January 10, 2023 memorandum).

        As required by section 525 of the James M. Inhofe National Defense Authorization Act
for Fiscal Year 2023, the January 10, 2023 memorandum rescinded the August 24, 2021 and
November 30, 2021 Secretary of Defense mandates that members of the Armed Forces be
vaccinated against the coronavirus disease 2019 (COVID-19) and thereby also rendered all DoD
Component policies, directives, and guidance implementing those vaccination mandates as no
longer in effect as of January 10, 2023. These include, but are not limited to, any COVID-19
vaccination requirements or related theater entry requirements and any limitations on
deployability of Service members who are not vaccinated against COVID-19.

        DoD Component policies, directives, and guidance have not been operative since the
January 10, 2023 memorandum was issued, regardless of the status of the DoD Component
conforming guidance. DoD Component heads shall formally rescind any such policies,
directives, and guidance as soon as possible, if they have not done so already. DoD Component
heads shall certify to the Under Secretary of Defense for Personnel and Readiness in writing that
these actions have been completed no later than March 17, 2023.

        The January 10, 2023 memorandum recognizes that other standing Departmental policies,
procedures, and processes regarding immunizations remain in effect, including the ability of
commanders to consider, as appropriate, the individual immunization status of personnel in
making deployment, assignment, and other operational decisions, such as when vaccination is



OSD001649-23/CMD002077-23

required for travel to, or entry into, a foreign nation. This continues to be the case, in accordance with the guidance below.

The Department's Foreign Clearance Guide will be updated to reflect that DoD personnel must continue to respect any applicable foreign nation vaccination entry requirements, including those for COVID-19. Other than to comply with DoD Foreign Clearance Guidance, DoD Component heads and commanders will not require a Service member or group of Service members to be vaccinated against COVID-19, nor consider a Service member's COVID-19 immunization status in making deployment, assignment, and other operational decisions, absent establishment of a new immunization requirement in accordance with the process described below. It is my expectation that any requests to the Assistant Secretary of Defense for Health Affairs (ASD(HA)) for approval to initiate mandatory immunizations of personnel against COVID-19 will be made judiciously and only when justified by compelling operational needs and will be as narrowly tailored as possible.

Department of Defense Instruction (DoDI) 6205.02, "DoD Immunization Program," July 23, 2019, will be updated as follows to establish a process requiring the Secretary of a Military Department, the Director of a Defense Agency or DoD Field Activity that operates medical clinics, or the Commandant of the Coast Guard, to submit a request for approval to initiate, modify, or terminate mandatory immunizations of personnel. Effective immediately, I direct the following action:

Paragraph 2.11. of DoDI 6205.02 is revised by adding a new subsection g., which will read:

"Submit requests to the ASD(HA) for approval to initiate, modify, or terminate mandatory immunizations of personnel and voluntary immunizations of other eligible beneficiaries determined to be at risk from the effects of deliberately released biological agents or naturally occurring infectious diseases of military or national importance."

The Commander of a Combatant Command must submit a request for approval to initiate, modify, or terminate mandatory immunizations of personnel through the Joint Staff, consistent with existing processes specified in DoDI 6205.02.

The Director of Administration and Management will make the revision directed above as a conforming change to the version of DoDI 6205.02 published on the DoD Issuances website.



**SECRETARY OF THE ARMY**
**WASHINGTON**

2 4 FEB 2023

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Army Policy Implementing the Secretary of Defense Coronavirus Disease 2019 (COVID-19) Vaccination Mandate Rescission

1.  References. See enclosure 1.

2.  On 10 Jan 23, the Secretary of Defense rescinded the COVID-19 vaccination mandate across the Department of Defense (DoD).  Accordingly, I hereby rescind all Department of the Army policies specifically associated with the implementation of the COVID-19 vaccination mandate.  This includes rescinding references d, e, f, g, h, and i.

3.  No currently serving Soldier[1] shall be separated based solely on their refusal to receive the COVID-19 vaccine if they sought an exemption on religious, administrative, or medical grounds.  I want to reinforce that the Department of the Army will:

   a.  Cease any ongoing reviews of current Soldiers' religious, administrative, or medical exemption requests if those requests are solely for the COVID-19 vaccine. These specific pending requests are deemed resolved through the elimination of the COVID-19 vaccination mandate.

   b.  Update the records of Soldiers who requested an exemption for the COVID-19 vaccine to remove or correct any adverse actions associated with denials of such requests, as well as favorably remove any flags associated with those adverse actions.

   c.  No longer require the COVID-19 vaccine for accessions.  Those currently in, or seeking admission to pre-commissioning programs, are no longer required to receive the COVID-19 vaccine.

   d.  In addition to the elimination of travel restrictions directed in reference c, remove any remaining travel restrictions based solely on COVID-19 vaccination status. Other standing Department of the Army policies, procedures, and processes regarding immunization and travel remain in effect, including combatant command, country clearance, and theater entry specific requirements.

---

[1] For the purposes of this policy, the term Soldier refers to Soldiers currently serving in the Regular Army (RA), Army National Guard (ARNG) / Army National Guard of the United States (ARNGUS), and U.S. Army Reserve (USAR); cadets at the United States Military Academy (USMA); cadet candidates at the United States Military Academy Preparatory School (USAMPS); and cadets in the Senior Reserve Officers' Training Corps (SROTC).

SUBJECT:  Army Policy Implementing the Secretary of Defense Coronavirus Disease 2019 (COVID-19) Vaccination Mandate Rescission

4.  To prevent any inconsistent disciplinary action based on past actions during the pandemic, I continue to withhold the authority to impose any non-judicial and judicial actions based solely on a Soldier's refusal to receive the COVID-19 vaccine while the mandate was in effect.

5.  Furthermore, I am issuing the following guidance for updating the records and adjudicating pending exemption requests for Soldiers who sought an exemption.

   a.  Completed / Denied Exemption Requests.  Personnel records for Soldiers who sought, but were denied, an exemption on religious, administrative, or medical grounds to the COVID-19 vaccination requirement will be updated as follows:

      (1)  Pending Separations.  Effective immediately, Commanders will rescind all pending involuntary separation actions pursuant to reference d.  The Soldier's flag (Flag Code B) will be closed as *favorable*.

      (2)  Suspension of Favorable Actions (Flags).  Effective immediately, U.S. Army Human Resource Command (HRC), in coordination with the Deputy Chief of Staff G-1 (DCS G-1) will *favorably* close the flag for Soldiers who sought an exemption and are flagged (Flag Code A) for failure to comply with the lawful order to receive the COVID-19 vaccination.

      (3)  General Officer Memoranda of *Reprimand* (GOMOR).  Effective immediately, HRC, in coordination with DCS G-1, will remove GOMORs from a Soldier's Army Military Human Resource Record (AMHRR) if the GOMOR was issued for the failure to comply with the lawful order to receive the COVID-19 vaccine and the Soldier previously sought an exemption.

         (a)  Filing authorities will immediately withdraw and destroy locally filed GOMORs issued for the failure to comply with the lawful order to receive the COVID-19 vaccine for Soldiers who previously sought an exemption.

         (b)  GOMORs that have been issued for the failure to comply with the lawful order to receive the COVID-19 vaccine where the Soldier previously sought an exemption, but are not yet filed, will be rescinded.

      (4)  Bars to Continued Service.  Effective immediately, HRC, in coordination with DCS G-1, will remove all bars to continued service if the bar was based on the Soldier's failure to comply with the lawful order to receive the COVID-19 vaccination and the Soldier previously sought an exemption.

      (5)  Evaluation Reports.  Within 30 days of the publication of this policy, HRC, in coordination with DCS G-1, will contact the Soldier and their rating chain if a negative

SUBJECT:  Army Policy Implementing the Secretary of Defense Coronavirus Disease 2019 (COVID-19) Vaccination Mandate Rescission

evaluation report was based on the Soldier's failure to comply with the lawful order to receive the COVID-19 vaccine and the Soldier previously sought an exemption.

(a)    Soldiers, working with their rating chain, will determine if the evaluation should be maintained, modified, or removed from Soldier's AMHRR to achieve the most advantageous outcome for the Soldier.

(b)    For evaluations that are pending but not yet filed, rating officials will remove annotations documenting vaccine refusal that were included in the evaluation pursuant to reference d.

(6)    Adverse Actions Referencing Additional Misconduct.  As stated above, HRC, in coordination with DCS G-1, will update personnel records to remove all adverse actions for Soldiers who sought, but were denied, an exemption on religious, administrative, or medical grounds to the COVID-19 vaccination requirement.  If the adverse action was taken due to other instances of misconduct, Commanders may initiate adverse actions based on the other misconduct not associated with the failure to comply with the lawful order to receive the COVID-19 vaccine.

(7)    Reporting.  Within 45 days of the publication of this policy, HRC will report the actions taken to update Soldiers' personnel records.  The General Court Martial Convening Authority (GCMCA) or equivalent authority will validate the report within 15 days of receipt from HRC.  Soldiers who were inadvertently excluded in the report will notify their GCMCA.

b.  Pending Exemption Requests.  Rescission of the DoD COVID-19 vaccination mandate eliminates the need for the Army to adjudicate pending exemption requests based on religious, administrative, or medical grounds.

(1)    Notification.  Within 30 days of the publication of this policy, the Office of the Surgeon General (OTSG), in coordination with the Assistant Secretary of the Army (Manpower and Reserve Affairs) (ASA(M&RA)), will notify Soldiers who sought an exemption (or appealed a denied exemption) solely for the COVID-19 vaccination mandate that no further action be taken.  The Soldier will be notified through the GCMCA or equivalent authority that submitted the request. Commanders will notify each Soldier in writing within seven days of receipt of notification.

(2)    Multiple Vaccine Exemption Requests.  Within 30 days of the effective date of this policy, Soldiers who sought exemption to other mandatory vaccines along with their request for exemption from the COVID-19 vaccine must resubmit their request if they continue to seek an exemption from the other vaccines.

(a)    Soldiers who submitted multiple vaccine exemption requests did not consistently provide information related to non-COVID vaccine requests. To ensure fair

SUBJECT:  Army Policy Implementing the Secretary of Defense Coronavirus Disease 2019 (COVID-19) Vaccination Mandate Rescission

and expeditious processing of these requests, request for exemption should be specific to the vaccine and must address how receipt of each vaccine substantially burdens the Soldier's exercise of religion.

(b)   To expedite the process, Soldiers are not required to receive additional counseling or training/education by a Chaplain or Medical Provider if the request is re-submitted within 30 days of notification. The new request must otherwise comply with the existing processes contained in Army Regulation (AR) 600-20, *Army Command Policy*, Appendix P-2.

(c)   Commanders will ensure resubmissions are processed within 30 days. Commanders have the authority to determine if a new command recommendation is warranted based on the information in the request.

(3)  Reporting.  On a monthly basis, GCMCAs or equivalent authorities will report the number of Soldiers notified and the projected number of resubmissions.  OTSG will validate and report the number of exemption requests and appeals adjudicated to include the number of approvals and denials in each category.

6.  Former Soldiers may petition the Army Discharge Review Board and the Army Board for Correction of Military Records to request corrections to their personnel records, including records regarding the characterization of their discharge.

7.  Additional Army policy and guidance to effect this rescission and implement DoD policy will be issued by the Assistant Secretary of the Army (Manpower and Reserve Affairs) as necessary and appropriate.

8.   I am proud of the efforts the Department of the Army has taken to respond to the COVID-19 pandemic. We will continue to promote and encourage COVID-19 vaccination for all personnel to ensure readiness, facilitate mission accomplishment, and protect our force.

Encls                                  Christine E. Wormuth

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
    U.S. Army Forces Command
    U.S. Army Training and Doctrine Command
(CONT)

SUBJECT:  Army Policy Implementing the Secretary of Defense Coronavirus Disease 2019 (COVID-19) Vaccination Mandate Rescission

DISTRIBUTION: (CONT)
    U.S. Army Materiel Command
    U.S. Army Futures Command
    U.S. Army Pacific
    U.S. Army Europe and Africa
    U.S. Army Central
    U.S. Army North
    U.S. Army South
    U.S. Army Special Operations Command
    Military Surface Deployment and Distribution Command
    U.S. Army Space and Missile Defense Command/Army Strategic Command
    U.S. Army Cyber Command
    U.S. Army Medical Command
    U.S. Army Intelligence and Security Command
    U.S. Army Corps of Engineers
    U.S. Army Military District of Washington
    U.S. Army Test and Evaluation Command
    U.S. Army Human Resources Command
Superintendent, U.S. Military Academy
Commandant, U.S. Army War College
Director, U.S. Army Civilian Human Resources Agency
Executive Director, Military Postal Service Agency
Superintendent, Arlington National Cemetery
Director, U.S. Army Acquisition Support Center

CF:
Principal Cyber Advisor
Director of Business Transformation
Commander, Eighth Army

# REFERENCES

a.  Section 525 of the James M. Inhofe National Defense Authorization Act for Fiscal Year 2023.

b.  Secretary of Defense memorandum (Rescission of August 24, 2021, and November 30, 2021, Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces), 10 January 2023.

c.  Consolidated Department of Defense Coronavirus Disease 2019 Force Health Protection Guidance, Revision 4, 30 January 2023.

d.  Army Directive 2022-02 (Personnel Actions for Active-Duty Soldiers Who Refuse the COVID-19 Vaccination Order and Accession Requirements for Unvaccinated Individuals), 31 January 2022.

e.  Secretary of the Army Memorandum (Flagging and Bars to Continued Service of Soldiers Who Refuse the COVID-19 Vaccination Order), 16 November 2021.

f.  Secretary of the Army Memorandum (Unvaccinated Cadets at the United States Military Academy and United States Army Senior Reserve Officers' Training Corps), 14 December 2021.

g.  Secretary of the Army Memorandum (Delegation of Authority for Consolidated Department of Defense Coronavirus Disease 2019 Force Health Protection Guidance), 25 May 2022.

h.  Under Secretary of the Army Memorandum (Updated Guidance on Official Travel), 17 October 2022.

i.  All Army Activities (ALARACT) Message 009/2022 (Execution Guidance for Accessions and Active-Duty Soldiers Who Refuse the COVID-19 Vaccination Order), 2 February 2022.

j.  Army Regulation 600-8-2 (Suspension of Favorable Personnel Actions (FLAG)).

k.  Army Regulation 600-20 (Army Command Policy).

l.  Army Regulation 600-37 (Unfavorable Information).

m. Army Regulation 601-280 (Army Retention Program).

n.  Army Regulation 623-3 (Evaluation Reporting System).

Enclosure 1



**SECRETARY OF THE AIR FORCE**
**WASHINGTON**

February 24, 2023

MEMORANDUM FOR ALMAJCOM-FOA-DRU/CC
                DISTRIBUTION C

SUBJECT: Department of the Air Force (DAF) Guidance on Removal of Adverse Actions and Handling of Religious Accommodation Requests

In accordance with my 23 January 2023 memorandum "Rescission of 3 September 2021 Mandatory Coronavirus Disease 2019 Vaccination of Department of the Air Force Military Members and 7 December 2021 Supplemental Coronavirus Disease 2019 Vaccination Policy Memoranda," I want to reinforce that all policies within the Department of the Air Force associated with the implementation of the Coronavirus Disease 2019 (COVID-19) vaccination mandate for Service members were also rescinded. Commanders at all levels must ensure that associated guidance derived from the mandate is rescinded. Refer to USD(P&R) Re: Consolidated Department of Defense Coronavirus Disease 2019 Force Health Protection Guidance - Revision 4, 30 January 2023 for current force health protection guidance.

I am issuing the following additional guidance with respect to the removal of adverse actions, and the handling of religious accommodation requests for those Service members who refused vaccination. At the time the actions were taken, they were appropriate, equitable and in accordance with valid lawful policy in effect at the time; however, removal of those actions is now appropriate in some circumstances.

     a. Removal of Adverse Information: Currently serving Regular Air Force (RegAF), Space Force, Air National Guard, and Air Force Reserve members [including those involuntarily reassigned to the Inactive Ready Reserve] who sought an exemption on religious, administrative, or medical grounds, and who received adverse actions solely due to their refusal to receive a Coronavirus Disease 2019 (COVID-19) vaccine shall have these items removed as detailed below. The Service member must have formally sought an accommodation on religious, administrative, or medical grounds prior to or concurrent with the official initiation of the adverse action in order to receive relief under this memorandum. Commanders will ensure the removal of such adverse actions from currently serving Service members' records in accordance with the below guidance. Members will be notified by their command or record holder (e.g. Air Force Personnel Center, Air Reserve Personnel Center) when the adverse actions have been removed from their records. This policy does not apply to members who refused the COVID-19 vaccination and did not request an exemption. Members who did not seek an exemption may petition their chain of command under existing DAF policy or the Air Force Board for Correction of Military Records (AFBCMR) for removal of adverse information if they believe an injustice or error has occurred. The process to petition the AFBCMR may be found at: https://Afrba-portal.cce.af.mil.

1) Letters of Admonishment, Counseling, or Reprimand, and Records of Individual Counseling issued solely for vaccine refusal after requesting an exemption as described above will be rescinded. Removal of actions for enlisted members will follow the procedures in DAFI 36-2907. Removal of officer adverse actions will follow DAFI 36-2907, except that the removal of Letters of Counseling related to a substantiated finding from an officially documented investigation, Letters of Admonishment and Letters of Reprimand from a Personnel Information File (PIF) or Unfavorable Information File (UIF) is delegated to commanders in the member's current chain of command who are equal or senior in grade to the initial imposing authority. Where the administrative action addresses additional misconduct, the administrative action will be redacted to remove all language associated with the member's refusal to receive the COVID-19 vaccine. Commanders will make new determinations as to whether to uphold, downgrade, or withdraw the administrative action and entry into a PIF or UIF without consideration of the refusal to receive the COVID-19 vaccine. Any requirement for AFBCMR direction for removal of actions from Military Human Resource Records or other files will be accomplished by AFPC/ARPC as appropriate if removal is required under this memorandum. The member's command will inform AFPC/ARPC which adverse actions will be removed, redacted, or replaced.

2) Nonjudicial punishments issued solely for vaccine refusal after requesting an exemption as described above will be set aside in their entirety. Nonjudicial punishments issued partially for such vaccine refusal will have the vaccine refusal portion set aside and the remainder of the nonjudicial punishment reassessed for appropriateness. When the set aside is more than four months after the execution of the punishment, commanders should reference the SecDef Memo dated 10 January 2023 on an attachment to the AF Form 3212.

3) Referral Performance Reports issued solely for vaccine refusal after requesting an exemption as described above will have the referral report removed from the member's personnel record and replaced with a statement of non-rated time. Where the referral report addresses additional misconduct, the report will be redacted to remove all language associated with the member's refusal to receive the COVID-19 vaccine and the rater and/or additional rater will reassess if the remaining report should remain a referral.

4) Promotion Records will be corrected by the record holder (e.g., AFPC, ARPC, SAF/IG) to remove or redact, as appropriate, all adverse actions related to the member's refusal to receive the COVID-19 vaccine.

5) Promotion Propriety Actions will continue processing in accordance with DAFIs 36-2501 and 36-2504 and may only be closed by Secretarial action.

6) Current involuntary discharge proceedings will be terminated IAW the procedures in DAFI 36-3211 if the basis was solely for refusal to receive the COVID-19 vaccine. If there are additional circumstances supporting discharge, commanders should make a determination as to whether to continue discharge proceedings, including re-notification of discharge.

7) Adverse actions removed under the provisions of this guidance memorandum contained in Inspector General files pursuant to AFI 90-301 will be removed from those files.

**b. Processing of religious accommodation requests (RARs) requesting an exemption to the COVID-19 vaccination requirement.**

1) Due to the recission of the COVID-19 vaccine mandate, all outstanding RARs for COVID-19 vaccination have been cancelled and will be returned without action.

2) Individuals, whose COVID-19 RAR also requested accommodation for other mandated vaccinations, may resubmit their RAR to their unit commander for non-COVID-19 vaccinations in accordance with DAFI 52-201. Previous requests should be updated to provide any additional information the member deems relevant to the specific vaccine(s) the member is requesting an accommodation for. In order to expedite processing, members who desire to submit a new accommodation are requested to do so within 30 days.

3) Commanders will expeditiously review and adjudicate RARs in accordance with DAFI 52-201 with the following exceptions. Upon resubmission by the member, unit commanders will review the revised package and provide a command recommendation. Following unit commander recommendation on the resubmitted package, if the RAR was previously reviewed by a Religious Resolution Team (RRT), it will be forwarded to the initial decision authority. Resubmitted RARs that were not previously reviewed by an RRT will be processed expeditiously through the DAFI 52-201 RRT process. Resubmitted RARs that were at the appellate authority will be forwarded by the unit commander to the initial decision authority. If the initial decision authority disapproves the requested accommodation, it will be forwarded directly to the appellate authority. Personnel at all levels will consider additional information provided by the applicant and the commander's recommendation.

Let me close by expressing my admiration to the men and women of this Department for the tremendous effort and accomplishments in response to the COVID-19 pandemic while also ensuring the readiness of the force and defense of the Nation. We will continue to encourage COVID-19 vaccination for all personnel to ensure readiness, facilitate mission accomplishment, and protect our people.

Frank Kendall
Secretary of the Air Force

cc:
AF/CC
SF/CSO



**THE SECRETARY OF THE NAVY**
WASHINGTON, D.C. 20350-1000

FEB 24 2023

MEMORANDUM FOR COMMANDANT OF THE MARINE CORPS
        CHIEF OF NAVAL OPERATIONS
        ASSISTANT SECRETARIES OF THE NAVY
        GENERAL COUNSEL OF THE NAVY
        JUDGE ADVOCATE GENERAL OF THE NAVY

SUBJECT: Department of the Navy Actions to Implement Coronavirus Disease 2019 Vaccine
     Rescission

Reference: (a) Secretary of Defense Memorandum, "Rescission of August 24, 2021 and
       November 30, 2021 Coronavirus Disease 2019 Vaccination Requirements for
       Members of the Armed Forces"
     (b) ALNAV 009/23, "Rescission of COVID-19 Vaccination Requirement for
       Members of the Armed Forces", January 20, 2023

    On 10 January 2023, Secretary of Defense (SECDEF) rescinded the COVID-19 vaccine
mandate across the Department of Defense in reference (a). Accordingly, I am canceling all
COVID-19 vaccine mandates directed by subordinate echelons of command within the
Department of the Navy as of that same date. Further, in reference (b), you were directed to
cease separating Sailors or Marines for refusal to receive the COVID-19 vaccination if those
members had sought accommodation for religious, medical, or administrative reasons.

    For those currently serving Sailors or Marines who previously submitted an
accommodation request or appeal solely for exemption from the COVID-19 vaccine, you will
consider those requests or appeals closed and return them without action. Such members will
remain in service with no adverse action related to the COVID-19 vaccine refusal. For those
religious accommodation requests that seek relief from the COVID-19 vaccine in addition to
other mandatory vaccines, you will return those requests to the Sailor or Marine and engage with
that member to ensure the remaining issues are properly focused and to determine how to
proceed. These Sailors and Marines have the option to withdraw their religious accommodation
request, or the appeal of that request if previously denied, or submit additional information that
might support their request, but they are not required to do so. Requests that have been
substantially processed may continue to be processed in those instances in which the Sailor or
Marine's remaining issues are clearly understood and ready for resolution, or you may return the
request to an earlier stage of the review for further effort to resolve the Sailor or Marine's
request, at your discretion.

    You will ensure the review of the records of all currently serving Service Members who
sought and were subsequently denied an exemption from the COVID-19 vaccination. The
service records for those Sailors and Marines so identified shall be reviewed and any adverse
information related to their COVID-19 vaccine refusal shall be removed from the service record.
All additional records corrections, including those for members who were denied an exemption
and were discharged, may be reviewed, at the request of such members or veterans, if he or she
chooses to petition the Board for Correction of Naval Records. You are hereby directed to

SUBJECT:  Department of the Navy Actions to Implement Coronavirus Disease 2019 Vaccine
         Rescission

modify future selection board convening orders and precepts to include language ensuring the
boards do not consider any adverse information related solely to COVID-19 vaccine refusal in
cases in which an accommodation was requested.

     The Department of the Navy remains committed to protecting our people.  I expect you to
clearly communicate the processes and procedures of this memorandum and references (a) and
(b) to your Sailors and Marines, and provide any necessary amplifying guidance.  The
Commandant of the Marine Corps and the Chief of Naval Operations will report back to me
within 30 days of the date of this memorandum to provide the process, timeline and status of
your reviews.

                              Carlos Del Toro

cc:
ACMC
VCNO
DUSN
AUDGEN
CHINFO
DMCS
DNS
JAG
DON CIO
NAVIG
NCIS
OCMO
OLA
OSBP
Echelon 1 and 2 commands



**NATIONAL GUARD BUREAU**
1636 DEFENSE PENTAGON
WASHINGTON DC 20301-1636
JAN 1 8 2023

MEMORANDUM FOR THE ADJUTANTS GENERAL AND COMMANDING GENERAL, DISTRICT OF COLUMBIA

SUBJECT:   Return of Non-Federalized T32 National Guard Service Members to Non-Federalized Title 32 Duty

On January 10, 2023, the Secretary of Defense rescinded both the August 24, 2021 memorandum, "Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members" and the November 30, 2021 memorandum, "Coronavirus Disease 2019 Vaccination of Members of the National Guard and the Ready Reserve."

In coordination with the Under Secretary of Defense for Personnel and Readiness (USD(P&R)) and the Secretaries of the Army and Air Force, all currently serving non-federalized Army National Guard and Air National Guard members who are not fully vaccinated for COVID-19, but are otherwise qualified and eligible are no longer prohibited from, and may be directed to resume participation in drills, training and/or other duty conducted under Title 32, U.S. Code, to include AGR and FTNGD-OS duties.

This implementation guidance is effective for non-federalized duty originally scheduled to be conducted on or after January 10, 2023.  Additional guidance to ensure uniform implementation of the rescission memorandum will be developed in collaboration with USD(P&R) and the Military Departments, as appropriate.

Please address any questions regarding this guidance to Major General Wendy Wenke, 703-604-9540 or wendy.b.wenke.mil@army.mil.

Daniel R. Hokanson
General, USA
Chief, National Guard Bureau

Appx14



**NATIONAL GUARD BUREAU**
1636 DEFENSE PENTAGON
WASHINGTON DC  20301-1636

FEB 0 3 2023

MEMORANDUM FOR ALL NATIONAL GUARD PERSONNEL

Subject:  Updated National Guard Bureau Official Coronavirus Disease 2019 Travel
Guidance

Reference:  Under Secretary of Defense "Consolidated Department of Defense
Coronavirus Disease 2019 Force Health Protection Guidance - Revision 4,"
30 January 2023

1.  This memorandum cancels and replaces all previous National Guard Bureau Travel
guidance regarding the Coronavirus Disease 2019 (COVID-19) in accordance with the
reference.  All previous COVID-19 NGB guidance is hereby revoked specifically
including the NGB Memorandum, "Updated National Guard Official Coronavirus
Disease 2019 Travel Guidance," 18 May 2022, and the NGB Memorandum, "Annual
Training Declared Mission-Critical Travel for Individuals Not Fully-Vaccinated Against
Coronavirus Disease 2019," 10 June 2022.

2.  Individuals who are not vaccinated are now authorized for official travel and the
approval process is rescinded.  No personnel may engage in official travel if they have
tested positive for COVID-19 and have not yet met the criteria for discontinuing
isolation, they are symptomatic, or they have pending COVID-19 test results.  Personnel
should avoid official travel until 10 calendar days after their symptoms started or the
date of their positive test.  If these personnel must travel on days 6 through 10, they
must properly wear a well-fitting mask the entire duration of travel, even if mask wearing
is not otherwise required by the reference.  Official travel should also be delayed if, in
the past 10 days, an individual has been exposed to someone who has tested positive
for, and/or been symptomatic of, COVID-19.  Prior to travel, all official travelers should
be educated on how to self-monitor and what actions to take if one develops signs or
symptoms develop consistent with COVID-19 or traveler contracts COVID-19.

3.  During all official travel, travelers will follow all applicable Federal, State, local, and
commercial air carrier requirements and applicable host nation requirements.  Additional
requirements may be necessary when traveling to, or from, locations outside, and
within, the United States.  Official international travelers should review Geographic
Combatant Commands policies prior to travel.

4.  National Guard personnel on official travel will complete any required health and
restriction of movement measures, including home-based quarantine or self-isolation, if
required, prior to the end of the official duty period.

5.  National Guard personnel on official travel who are not eligible for treatment at a
military medical treatment facility, or who are not within the established access radius

around a military medical treatment facility, may obtain official travel-related testing at a civilian testing site and submit for reimbursement on their travel voucher.

6.  National Guard Service members must attest that, to the best of their knowledge, their family members traveling on official orders have followed the same requirements as those set forth for Service members in this guidance.  Failure to do so may result in delay or cancellation of previously authorized travel.

7.  For National Guard members supporting Federal Emergency Management Agency mission assignments or for other activities undertaken by National Guard personnel in a Title 10 or Title 32 duty status, the Chief of the National Guard Bureau, in coordination with the Secretaries of the Army and the Air Force, may issue redeployment guidance to the States, Territories, and the District of Columbia to support mission requirements, while minimizing risks to National Guard members and local communities.

8.  Point of contact is Colonel Lesley Kipling; National Guard Bureau Executive Secretariat; 703-601-7733.

MARC H. SASSEVILLE
Lieutenant General, USAF
Vice Chief, National Guard Bureau

JOINT FORCE HEADQUARTERS - ARIZONA
Office of the Adjutant General
5636 East McDowell Road
Phoenix, Arizona 85008-3495

ORDERS: 04-1117-00007                                          27 Apr 2021

BOTELLO JEREMIAH                              CPT  ████████████████
(WP9MAA)1120 TC HHD HHD TRANS MOTOR           6202 W MYRTLE AVE  GLENDALE AZ 85301-1792


Your are ordered to Full-Time National Guard Duty-Operational Support (FTNGD-OS), and with
your consent, for the purpose of Operational Support other than for training for the period
shown plus allowable travel time. Upon completion of the duty unless sooner released or
extended by proper authority, you will return to the place entered and be released from such
duty.

PERIOD (TDY): 01 MAY 2021 - 30 Sep 2021
REPORT TO: 5636 E McDowell RD, PHX 85008; with follow-on travel as directed, PHOENIX, AZ
REPORT TIME/DATE: NLT 800 01 May 2021
ATTACHED TO:  0285 AV BN 02 CO A ASSAULT CO WP7VA0
PURPOSE: In support of FEMA MA 4524 DR-AZ-COIVD-19 Pandemic
Additional Instructions:
 (A) Soldiers with orders authorizing travel entitlements beyond mileage reimbursement will
 file their voucher utilizing DTS. Mileage only entitlements can be reimbursed via Military
 Pay.
 (B) THIS IS A PAY ORDER ONLY! Travel authorization and Voucher must be completed in the
 Defense Travel System (DTS).
 (C) You are subject to the Arizona Code of Military Justice.
 (D) TAMP is authorized for SM's who served 30 continuous days and are separating from
 Active service on or after January 1, 2021  per SEC DEF memo dated 2/8/2021
 (E) Government quarters are available and directed, unless a statement of non-availability
 is provided by the JTF J-4.
 (F) This is not a contingency operation. EID is not authorized.
 (G) Project Code:  X10 - COVID19 Response Support
 (H) "Activation Authority:  this duty is performed under 32 USC502 (f)2(A) in support of
 Presidential Proclamation 9994, March 13, 2020 (Declaring a National Emergency Concerning
 the Novel Coronavirus Disease (COVID-19) and is exempt from the USERRA five year cumulative
 limit."
 (I) You are personally responsible to pay all charges by the statement due date regardless
 of travel voucher payment. It is REQUIRED that split-disbursement be selected for travel
 settlements accounts.
 (J) All travelers are reminded that under Public Law 105-264, use of the government travel
 card is mandatory for all lodging expenses, rental car expenses and transportation expenses
 incurred by the traveler. The GTCC will not be used to purchase discretionary travel (e.g.
 leave),circuitous routings or travel to/from locations not stated on orders.
 (K) Soldier must understand that he/she will not be retained on active duty to complete 20
 years of Active Federal Service for retirement purposes if 18 or more years of Active
 Federal Service are completed while serving on this tour.
 (L) You are not authorized to report earlier than the date specified on Orders.
 (M) Government meals are not available or directed.
 (N) Order is Subject to availability of funds.
 (O) Govt meals and quarters are not available.

FOR ARMY USE:
AUTH:32 USC 502(f)(1)(B)
HOR: ████████████████████
APC DJMS-RC: 18GFBO TDC CBO - COVID FY21 AZ   TITLE 32

ACCT CLAS:
 P & A - OFFICER: 021 206010F21 A18OO 1198/1199/1250/21T2 1Z1122VHUR 40088774 021001 ODS
 P9MAA

FOR OFFICIAL USE ONLY - PRIVACY ACT

JOINT FORCE HEADQUARTERS - ARIZONA
Office of the Adjutant General
5636 East McDowell Road
Phoenix, Arizona 85008-3495

ORDERS: 04-1117-00007A01                                              18 Aug 2021

BOTELLO JEREMIAH                              CPT ████████████
(WP9MAA)1120 TC HHD HHD TRANS MOTOR           6202 W MYRTLE AVE  GLENDALE AZ 85301-1792


The following order is amended as follows.

SO MUCH OF: FORMAT: 282 04-1117-00007 DATED 27 APR 2021 IS FURTHER AMENDED.

PERTAINING TO: ORDER TO ACTIVE DUTY
               BOTELLO JEREMIAH
               533 80 2851 CPT CH

AS READS:
  END DATE: 30 SEP 2021
  TOUR LENGTH: 153

HOW CHANGED:
  END DATE: 13 SEP 2021
  TOUR LENGTH: 136


FOR ARMY USE: AUTHORITY: 32 USC 502(f)(1)(B)
ACCT CLAS: 021 206010F21 A18OO 1198/1199/1250/21T2 1Z1122VHUR 40088774 021001 021 206010F21
 A18OO 1198/1199/1250/21T2 1Z1122VHUR 40088774 021001 ODS P9MAA

FORMAT: 700

FOR THE ADJUTANT GENERAL:

                                    ********************
                                    *   HQ, AZARNG     *
                                    *    OFFICIAL      *
                                    ********************
                                    MARGARET E. BIELENBERG
                                    COL, GS, AZARNG
                                    DEPUTY CHIEF OF STAFF G1

DISTRIBUTION: 1 SOLDIER
 1 1120 TC HHD HHD TRANS MOTOR 6202 W MYRTLE AVE  GLENDALE AZ 85301-1792
 1 0285 AV BN 02 CO A ASSAULT CO 5636 EAST MCDOWELL ROAD  PHOENIX AZ 85008-3455
 1 AZ

FOR OFFICIAL USE ONLY - PRIVACY ACT

JOINT FORCE HEADQUARTERS - ARIZONA
Office of the Adjutant General
5636 East McDowell Road
Phoenix, Arizona 85008-3495

ORDERS: 04-1236-00006                                    24 Aug 2021

BOTELLO JEREMIAH                            CPT
(WP9MAA)1120 TC HHD HHD TRANS MOTOR        6202 W MYRTLE AVE   GLENDALE AZ 85301-1792


You are ordered to Full-Time National Guard Duty-Other Training Duty (FTNGD-OTD), and with
your consent for the period shown plus allowable travel time. Upon completion of the period
of duty unless sooner released or extended by proper authority, you will return to the place
where you entered and be released from such duty.

PERIOD (TDY): 14 SEP 2021 - 16 Dec 2021
REPORT TO: FORT JACKSON, SC 29207, FT JACKSON, SC
REPORT TIME/DATE: NLT 800 14 Sep 2021
ATTACHED TO:  1120 TC HHD HHD TRANS MOTOR WP9MAA
PURPOSE: CHAPLAIN BASIC OFFICER LEADER
Additional Instructions:
(A) Soldiers with orders authorizing travel entitlements beyond mileage reimbursement will
file their voucher utilizing DTS. Mileage only entitlements can be reimbursed via Military
Pay.
(B) Travel of dependents and shipment of other than TDY weight allowance is not authorized.
(C) Travel by Commercial Carrier Authorized - Travel by POV for the traveler's convenience
is authorized. However, reimbursement is limited to the Constructive Cost of Common
Carrier. Reservation will be made through Defense Travel System.
(D) Payroll will be submitted by the Unit of Assignment.
(E) Subject to availability of funds.
(F) THIS IS A PAY ORDER ONLY! Travel authorization and Voucher must be completed in the
Defense Travel System (DTS).
(G) You are subject to the Arizona Code of Military Justice.
(H) The TTRA stipulates that the GTCC will be used by all U.S. Government personnel,
military and civilian, to pay for costs incident to official government travel unless
specifically exempt.
(I) You are personally responsible to pay all charges by the statement due date regardless
of travel voucher payment. It is REQUIRED that split-disbursement be selected for travel
settlements accounts.
(J) Govt meals and quarters are not available.

FOR ARMY USE:
AUTH:32 USC 502(f)(1)(B)
HOR:
APC DJMS-RC: A3F221 TDC 221 - PROFESSIONAL CAREER DEVELOPMENT TRAINING

ACCT CLAS:
 P&A-OFFICER: 021 206010D21 A18BR 1198/1199/1250/21T2 1F1132TRIT 40123857 021001 ODS P9MAA
 P&A-OFFICER: 021 206010D22 A18BR 1198/1199/1250/21T2 1F1132TRIT 40123857 021001 ODS P9MAA

SDN:BOT2851T600006                          TAC:
PEBD: 11 May 2005
FEDERAL WE:
STATE TAX CODE: AZ
MARITAL STATUS/NUMBER OF DEPENDENTS: S00
TYPE OF INCENTIVE PAY: NONE
TYPE OF SPECIAL PAY: NONE
SCTY CL: TOP SECRET WITH SCI
FORMAT: 282

FOR THE ADJUTANT GENERAL:

                                    *******************
                                    *   HQ, AZARNG    *
                                    *    OFFICIAL     *
                                    *******************
                                    MARGARET E. BIELENBERG
                                    COL, GS, AZARNG
                                    DEPUTY CHIEF OF STAFF G1
DISTRIBUTION: 1 SOLDIER
 1 1120 TC HHD HHD TRANS MOTOR 6202 W MYRTLE AVE  GLENDALE AZ 85301-1792
 1 AZ

FOR OFFICIAL USE ONLY - PRIVACY ACT

ORDERS 04-1117-00007  27 Apr 2021

SDN:BOT2851T700007                    TAC:
PEBD: 11 May 2005
FEDERAL WE:
STATE TAX CODE: AZ
MARITAL STATUS/NUMBER OF DEPENDENTS: S00
TYPE OF INCENTIVE PAY: NONE
TYPE OF SPECIAL PAY: NONE
SCTY CL: TOP SECRET WITH SCI
FORMAT: 282

FOR THE ADJUTANT GENERAL:

```
                              ********************
                              *   HQ, AZARNG     *
                              *     OFFICIAL      *
                              ********************
                              MARGARET E. BIELENBERG
                              COL, GS, AZARNG
                              DEPUTY CHIEF OF STAFF G1
```

DISTRIBUTION: 1 SOLDIER
 1 1120 TC HHD HHD TRANS MOTOR 6202 W MYRTLE AVE  GLENDALE AZ 85301-1792
 1 0285 AV BN 02 CO A ASSAULT CO 5636 EAST MCDOWELL ROAD  PHOENIX AZ 85008-3455
 1 AZ

FOR OFFICIAL USE ONLY - PRIVACY ACT

# RETIREMENT ACCOUNTING STATEMENT

For use of this form, see AR 135-180; the proponent agency is DCS, G-1 — DATE: 20230508

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

| | |
|---|---|
| AUTHORITY: | AR 135-180 |
| PRINCIPAL PURPOSE: | To provide members of the Reserve Components a detailed listing of retirement points earned in the previous completed anniversary years.  To assist units and Soldiers in verifying retirement points earned during the annual review.  The purpose of soliciting the DOB is for positive identification.  Identify the individual and his/her service record.  Determine creditable service for retirement and other benefits. |
| ROUTINE USE(S): | The DoD Blanket Routine Uses may apply to this collection. |
| DISCLOSURE: | Voluntary.  However, failure to furnish information may result in denial of retirement. |

| NAME JEREMIAH BOTELLO | | RANK CPT | LAST4 ██████ | CUR SVC TYPE IRR-RE | NG STATE / COMPONENT ARRCA |
|---|---|---|---|---|---|
| DIEMS 20030605 | PEBD 20060923 | BASD 20170112 | CUR AY 0219 | DATE EST ELIGIBLE RET PAY 2034-02-19 | HGH Not Calculated |

| BEGIN DATE | END DATE | MIL PER CLASS | SERVICE TYPE | INACTIVE DUTY POINTS | EXT COURSE POINTS | MEMBER-SHIP POINTS | ACTIVE DUTY POINTS | QUALIFYING FOR RETIREMENT | | | POINTS EARNED | POINTS CREDIT-ABLE | NOT CREDITED REASON(S) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | YRS | MOS | DAYS | | | |
| 20050814 | 20051220 | E | ARNG | 0 | 0 | 5 | 129 | 00 | 04 | 08 | 134 | 129 | X |
| 20060421 | 20060604 | E | ARNG | 0 | 0 | 2 | 45 | 00 | 07 | 22 | 47 | 45 | X |
| 20060605 | 20060829 | E | ARNG | 0 | 0 | 4 | 86 | 00 | 02 | 25 | 90 | 86 | X |
| 20150220 | 20160129 | E | ARNG | 75 | 0 | 0 | 36 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20160130 | 20160219 | E | ARNG (AGR) | 0 | 0 | 15 | 21 | 01 | 00 | 00 | 147 | 147 | 0 |
| 20160220 | 20160303 | E | ARNG (AGR) | 0 | 0 | 0 | 13 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20160304 | 20160418 | E | ARNG | 14 | 0 | 0 | 0 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20160419 | 20160531 | E | ARNG (AGR) | 0 | 0 | 0 | 43 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20160601 | 20160603 | E | ARNG | 6 | 0 | 0 | 0 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20160604 | 20160704 | E | ARNG (AGR) | 0 | 0 | 0 | 31 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20160705 | 20170219 | E | ARNG | 0 | 0 | 15 | 230 | 01 | 00 | 00 | 352 | 352 | 0 |
| 20170220 | 20170307 | E | ARNG | 0 | 0 | 0 | 16 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20170308 | 20171010 | E | ARNG | 17 | 0 | 0 | 22 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20171011 | 20180119 | E | ARNG (AGR) | 0 | 0 | 0 | 101 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20180120 | 20180219 | E | ARNG | 8 | 0 | 15 | 0 | 01 | 00 | 00 | 179 | 179 | 0 |
| 20180220 | 20190219 | E | ARNG | 37 | 0 | 15 | 14 | 01 | 00 | 00 | 66 | 66 | 0 |
| 20190220 | 20200219 | E | ARNG | 13 | 0 | 15 | 254 | 01 | 00 | 00 | 282 | 282 | 0 |
| 20200220 | 20200731 | E | ARNG (AGR) | 0 | 0 | 0 | 163 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20200801 | 20200930 | E | ARNG (AGR) | 0 | 0 | 0 | 61 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20201001 | 20201117 | E | ARNG | 0 | 0 | 0 | 0 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20201118 | 20210219 | E | ARNG | 4 | 0 | 15 | 0 | 01 | 00 | 00 | 243 | 243 | 0 |
| 20210220 | 20210316 | O | ARNG | 0 | 0 | 0 | 0 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20210317 | 20211216 | O | ARNG (AGR) | 0 | 0 | 0 | 275 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20211217 | 20220219 | O | ARNG | 10 | 0 | 15 | 0 | 01 | 00 | 00 | 300 | 300 | 0 |
| 20220220 | 20230219 | O | ARNG | 42 | 0 | 15 | 0 | 01 | 00 | 00 | 57 | 57 | 0 |
| 20230220 | 20230506 | O | ARNG | 8 | 0 | 0 | 0 | 00 | 00 | 00 | 0 | 0 | 0 |
| 20230507 | | O | IRR-RE | 0 | 0 | 0 | 0 | 00 | 00 | 00 | 0 | 0 | |
| | CAREER TOTALS | | | 234 | 0 | 131 | 1540 | 09 | 02 | 25 | 1897 | 1886 | |
| | | | | | | | | YRS | MOS | DAYS | | | |

Points Not Credited Reasons:

X – Exceeded Year Limit

S – Exceeded IDT Limit

Appx21

## ANNUAL DETAIL SUPPLEMENT
# RETIREMENT ACCOUNTING STATEMENT

For use of this form, see AR 135-180; the proponent agency is DCS, G-1          DATE: 20230508

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

| | |
|---|---|
| AUTHORITY: | AR 135-180 |
| PRINCIPAL PURPOSE: | To provide members of the Reserve Components a detailed listing of retirement points earned in the previous completed anniversary years. To assist units and Soldiers in verifying retirement points earned during the annual review. The purpose of soliciting the DOB is for positive identification. Identify the individual and his/her service record. Determine creditable service for retirement and other benefits. |
| ROUTINE USE(S): | The DoD Blanket Routine Uses may apply to this collection. |
| DISCLOSURE: | Voluntary. However, failure to furnish information may result in denial of retirement. |

| NAME<br>JEREMIAH BOTELLO | | RANK<br>CPT | LAST4<br>████ | CUR SVC TYPE<br>IRR-RE | NG STATE / COMPONENT<br>ARRCA |
|---|---|---|---|---|---|
| DIEMS<br>20030605 | PEBD<br>20060923 | BASD<br>20170112 | CUR AY<br>0219 | DATE EST ELIGIBLE RET PAY<br>2034-02-19 | HGH<br>Not Calculated |

| BEGIN DATE | END DATE | MIL PER CLASS | SERVICE TYPE | POINTS TYPE / DESCRIPTION | | | POINTS EARNED | PAID / NON-PAID | EARLY RETIRE ELIGIBLE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|
| 20220220 | 20230219 | O | ARNG | MEM | M | RPAM/RPAS Integration - Member | 15 | | N | |
| 20220305 | 20220305 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220306 | 20220306 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220401 | 20220401 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220402 | 20220402 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220403 | 20220403 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220513 | 20220513 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220514 | 20220514 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220515 | 20220515 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220604 | 20220604 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20220605 | 20220605 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20221015 | 20221015 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20221016 | 20221016 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20221105 | 20221105 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20221106 | 20221106 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20221202 | 20221202 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20221203 | 20221203 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20230107 | 20230107 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20230108 | 20230108 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20230203 | 20230203 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20230204 | 20230204 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |
| 20230205 | 20230205 | O | ARNG | IDT | I | RPAM/RPAS Integration - Inacti | 2 | Y | N | |

Appx22